MARSHAL HOUSE, INC. *vs.* RENT REVIEW AND GRIEVANCE BOARD OF BROOKLINE & another.[1]

Norfolk. May 8, 1970. — June 18, 1970.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, REARDON, & QUIRICO, JJ.

*Constitutional Law,* "Home Rule Amendment," Rent control, Police power, Municipalities. *Rent Control. Municipal Corporations,* "Home rule," Rent control.

A municipal ordinance or by-law regulating a civil relationship is permissible under § 7 (5) of art. 89 of the Amendments to the Massachusetts Constitution, without prior legislative authorization, only as an incident to the exercise of some independent, individual component of the municipal police power. [718]

In the absence of an explicit delegation to a town by the Legislature of power to engage in regulation of the landlord-tenant relationship, a rent control by-law of the town was invalid under art. 89, § 7 (5) of the Amendments to the Massachusetts Constitution; and a sever-

---

[1] The town also is named as a defendant.

ability provision in the by-law did not exclude from invalidity other provisions of the by-law subsidiary to and preliminary to the exercise of the purported general power to control rents.  [719–720]

BILL IN EQUITY filed in the Superior Court on October 14, 1969.

The suit was reported by *Roy*, J.

*James D. St. Clair* (*Stephen H. Oleskey* with him) for the petitioner.

*Eric Verrill* (*Acheson H. Callaghan, Jr.*, with him) for the Rent Review and Grievance Board of Brookline & another.

*Joseph J. Hurley*, First Assistant Attorney General, & *Edward L. Schwartz*, Assistant Attorney General, for the Attorney General, submitted a brief.

CUTTER, J.  The plaintiff (Marshal House) owns more than ten units of housing accommodations in Brookline.  It seeks declaratory relief against the board and the town concerning art. XXV (the by-law) of the Brookline by-laws, entitled "Unfair and Unreasonable Rental Practices in Housing Accommodations."  The pleadings, by agreement of the parties, constitute a case stated.  The case has been reported without decision by a Superior Court judge, who granted (by an interlocutory decree from which the board and the town appealed) a preliminary injunction preventing the distribution to landlords in the town of certain forms requesting information mentioned below.

The town on June 24, 1969, purported to adopt the by-law, which has been approved by the Attorney General. The by-law (§ 1) recites "that a serious public emergency exists with respect to the housing of . . . citizens of the town due to a substantial shortage of low and moderate income rental housing accommodations; that unless a rent review and grievance board is established to investigate . . . complaints of unfair and unreasonable rental practices . . . and . . . is empowered to order such practices to cease . . . and to make such other orders as it may deem just and proper, which may include an order that the landlord not . . . receive rent for the . . . occupation of specified housing accommodations in excess of an amount which

it shall determine to be fair and reasonable under the circumstances, such emergency . . . will produce serious threats to the public health, safety and general welfare of the citizens of the town."

Section 3 (a) creates a board of seven members (the town's assessor and its building commissioner, three "representatives of the public interest," one "representative of landlords," and one "representative of tenants") to deal with rent review matters. The board may receive complaints and review proposed rent increases (see § 3 [b] and [c]), and make studies on rent levels. See § 3 (e). The board may determine what rent is "fair and reasonable under the circumstances." [2]

The present controversy is most directly concerned with § 3 (f) which reads: "The [b]oard may, no more than once each year, require all landlords whose aggregate holdings exceed ten . . . units of housing accommodations . . . to file with the [b]oard, upon a form supplied by the [b]oard, information concerning their housing accommodations, including the rent currently being charged for each unit, the number of rooms in each unit, the number of persons occupying each unit, and whether . . . the tenancy is under a written lease." A form provided for filing ("under penalty of perjury") information under § 3 (f) directs each landlord to give the address of each building, the date of its construction or last substantial renovation, the date of its acquisition, the number of floors and rentable units, and the "[u]tilities supplied by the landlord without charge." It also requires, for each apartment, its number, size,

---

[2] The by-law then provides that the board may deal with complaints about rents, hold hearings, make findings, and enter orders. Such an "order may require that the landlord not demand, accept, or receive any rent for the use . . . of specified housing accommodations in excess of an amount which the [b]oard shall determine to be fair and reasonable under the circumstances; and may specify what housing conditions shall be corrected . . . and what services shall be furnished to the tenant at the rental so determined. The . . . order shall not require the landlord to . . . receive rent for specified housing accommodations that is less than the rent . . . received for such housing accommodations on January 1, 1969." Section 6 (b) provides a penalty of not more than $50 for a violation of any order of the board and for certain other violations, including failure seasonably to file with the board "such information as the [b]oard may require pursuant to" § 3 (f).

monthly rent (as of October 1, 1969), lease expiration date,
term of lease (and whether the lease, if any, contains a tax
clause), the parking provided, and the type of occupancy.

The principal contentions of the town and the board
are (a) that the town has been given by art. 89, § 6, of
the Amendments to the Constitution of the Commonwealth
very broad legislative power, subject only to the Legisla-
ture's power to supersede local legislation by general laws;
(b) that these powers under § 6 include the power to adopt
a rent control by-law without further authorization (by the
Legislature or otherwise) than is found in § 6; and (c) that
nothing in art. 89, § 7, so limits the power granted to the
town by § 6 as to preclude the adoption of the by-law or to
impair its validity. The Attorney General makes substan-
tially similar contentions. Marshal House, on the other
hand, takes the position that the by-law is invalid because
of art. 89, § 7, which states that nothing in art. 89 grants to
"any . . . town the power . . . (5) to enact private or
civil law governing civil relationships except as an incident
to an exercise of an independent municipal power." This
case thus requires our decision of issues concerning which, in
*Answer of the Justices,* 356 Mass. 769, we gave no advice
because of the absence of a "solemn occasion." See art. 85 of
the Amendments to the Constitution of the Commonwealth.

We quote (emphasis supplied) pertinent portions of art. 89.
Section 1 provides, in part, "It is the intention of this article
to reaffirm the . . . traditional liberties of the people with
respect to the *conduct of their local government,* and to grant
and confirm to the people of every . . . town the right of
self-government *in local matters,* subject to the provisions
of this article and to such standards and requirements as
the general court may establish by law in accordance with
the provisions of this article." Section 6 contains a broad
grant of powers to cities and towns, "Any . . . town may,
by the adoption . . . of local . . . by-laws, exercise any
power . . . which the general court has power to confer
upon it, *which is not inconsistent with the constitution* or laws
nacted by the general court in conformity with powers

reserved to the general court by section eight, and which is not denied . . . to the . . . town by its charter. . . ." The powers, which at first glance seem to be granted by § 6, are limited substantially by § 7, which reads: "Nothing in this article [89] shall be deemed to grant to any . . . town the power to (1) regulate elections . . .; (2) to levy . . . taxes; (3) to borrow money or pledge the credit of the . . . town; (4) to dispose of park land; (5) *to enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power;* or (6) to define and provide for the punishment of a felony or to impose imprisonment as a punishment for any violation of law; provided, however, that the *foregoing enumerated powers may be granted by the general court* in conformity with the constitution and with the powers reserved to the general court by section eight . . . ." Section 8 defines certain legislative powers reserved to and possessed by the General Court. No contention appears to be made that there is any basis of authority other than art. 89, § 6, for the town's action in enacting the by-law.

1. Ambiguity exists (as we pointed out in *Answer of the Justices*, 356 Mass. 769, 772) concerning the meaning of the italicized language in § 7 (5). This ambiguity is not substantially clarified by examination of the historical background of art. 89. See 1965 Senate Doc. No. 950, pp. 9, 21, 114, 131; 1966 Senate Doc. No. 846, p. 20; American Municipal Assn., Model Constitutional Provisions for Municipal Home Rule (1953); Fordham, Home Rule — AMA Model, 44 Natl. Municipal Rev. 137, 142; Sandalow, The Limits of Municipal Power under Home Rule, 48 Minn. L. Rev. 643, 674–679; Gere and Curran, Home Rule (Bureau of Pub. Affairs, Boston College and Bureau of Govt. Research, U. of Mass.), 33.[3] There is no very clear

---

[3] Earlier attempts at obtaining a home rule amendment are discussed not only in these Senate documents but also in 1961 Senate Doc. No. 580, pp. 96–97; 1962 Senate Doc. No. 650. See for general discussions, Antieau, Municipal Corporation Law, c. 3, esp. § 3.10, and c. 6; Vanlandingham, Municipal Home Rule in the United States, 10 Wm. and Mary L. Rev. 269, 310.

discussion of what is now art. 89, § 7 (5). The most complete analysis is that of Professor Sandalow (at pp. 676–677) and even that discussion, which attempts thoughtfully to resolve the ambiguities, seems to raise more questions than it answers.[4]   Professor Fordham, in his discussion of the particular language, also leaves the uncertainty unresolved. See 44 Natl. Municipal Rev. 137, 142, *supra.*   He says, "This is a phase of home rule which has not generally been adequately considered.   Obviously, we do not wish to give our cities the power to enact a distinctive law of contracts, for example.   On the other hand, the exercise of municipal powers is very likely to have important bearings upon private interests and relationships.   The approach of the . . . [language now in § 7 (5)] is to strike a balance by enabling home rule units to enact private law only as an incident to the exercise of some independent municipal power."   This court, as with respect to other parts of art. 89 (see *Opinion of the Justices,* 356 Mass. 761, 766–768; *Opinion of the Justices,* 356 Mass. 775, 787–788; *Opinion of the Justices, post,* 831, 834–835), thus is faced with interpreting novel and very general language concerning which there exist only inconclusive indications concerning the intentions of the draftsmen.

2. It is within the power of the Legislature, where there is reasonable basis in fact for such a determination, to conclude that an emergency exists in certain areas with respect to residential housing and to take action "in the exercise of its police power," including provisions for rent control, to relieve the emergency.   "Having adopted a

---

[4] Professor Sandalow points out that the language, now found in § 7 (5), relating to "private law making by a municipality is dependent upon not only the *existence* of an independent municipal power but 'an *exercise* of an independent municipal power.'   In view of this requirement and since 'independent municipal power' presumably means a power other than that of enacting private law, the most likely construction . . . is that private law may be enacted only if it is in aid of some municipal policy or program which is expressed, at least in part, by means other than the regulation of purely civil relationships."   The problem in the present case arises, of course, because whatever policy the town has attempted to carry out is (under the by-law) to be executed by the direct regulation of the civil relationship between landlord and tenant.

policy of rent control by . . . emergency legislation it may also delegate to . . . towns as governmental agencies the administration of its details in respect to matters peculiarly affecting local interests." See *Russell* v. *Treasurer & Recr. Gen.* 331 Mass. 501, 506–507.[5] We recognized in *Answer of the Justices,* 356 Mass. 769, 772, that the language of "§ 6 . . . standing by itself, is broad enough to authorize a . . . [town] to enact a rent control . . . by-law. The limitation in § 7 (5) simultaneously withholds part of the authority prima facie conferred by § 6, including the enactment of 'private or civil law governing civil relationships except as an incident to an exercise of independent municipal power.'" In *Cambridge Taxi Co.* v. *City Manager of Cambridge,* 322 Mass. 108, 109–110, we concluded that, under G. L. c. 40, § 22, authorizing a city to make ordinances for the regulation of vehicles, a city might (as an incident to a licensing system for taxicabs) "fix the rates to be charged." The fixing of rates in that case, however, was incidental to the exercise of a clearly defined, delegated power to regulate a transportation service having some aspects of a carrier or public utility. The rate fixing was at most a regulation of a temporary relationship between the taxi operator and his customer. The by-law before us, on the other hand, at least as a matter of degree, more directly intervenes in the continuing landlord-tenant relationship. This it does by efforts to restrict the rent which may be charged to the tenant in leases and tenancies of a type frequently granted by owners of residential real estate. The by-law thus purports to control the principal incentive to the landlord for entering into the relationship at all.

3. The town argues that art. 89, § 7 (5), should be strictly construed. So far as § 7 removes specified subjects from the scope of municipal legislative action, the several exclusions must be interpreted broadly enough to accomplish their

---

[5] As to the termination of post-World War II rent regulation in Massachusetts, see St. 1955, c. 225, § 2. See also *Nayor* v. *Rent Bd. of Brookline,* 334 Mass. 132, 135–136.

716                                    357 Mass. 709

Marshal House, Inc. *v.* Rent Review & Grievance Board of Brookline.

purposes. Certainly there is no basis for any limited interpretation of the exclusions found in § 7 (1), concerning elections; in § 7 (2), prohibiting local tax legislation; in § 7 (3), with respect to borrowings; and in § 7 (4), in the matter of disposing of park lands. The term "private or civil law governing civil relationships" is broad enough to include law controlling ordinary and usual relationships between landlords and tenants. The language is not so confined as clearly to apply only to general legislation like the Uniform Commercial Code (see G. L. c. 106), or the laws governing marriage (see G. L. c. 207) or intestate succession to property (see G. L. c. 190).

4. The town contends that the "by-law is a public law governing the economic relationship between landlords and tenants, not a private [or civil] law governing civil relationships." It also is argued that it is "in substance a temporary substitute for market forces . . . distorted by unusual conditions," rendering unreliable the usual process of determining "the amount of rent for an apartment . . . by bargaining between the landlord and [the] tenant." The by-law gives power to the board to require (see § 4 [d]) a landlord to "desist from . . . [an] unfair . . . rental practice" (defined in § 2 [g] as receiving any "rent . . . excessive under the circumstances"), to prevent (see fn. 2, *supra*) the receipt of such rent; and to regulate the "services . . . [to] be furnished" for such rent. In these aspects, although we assume the purpose of thus affecting the landlord-tenant relationship to be public, the method adopted is primarily civil in that it affords to the board power in effect to remake, in important respects, the parties' contract creating a tenancy. The by-law also imposes criminal penalties in the form of fines. See § 6 (b).

We do not regard the public objectives and the various public and criminal aspects of the by-law as conclusive in determining whether the by-law is within the exclusion found in art. 89, § 7 (5). The civil, private, public, and criminal aspects of the by-law may "overlap" to some extent. Cf. *Garner* v. *Teamsters, Chauffeurs, & Helpers*

*Local Union No. 776 (A. F. L.)*, 346 U. S. 485, 500. Also the methods of carrying out the public objective contained in the by-law are predominantly civil in character and directly affect a civil relationship.

5. The question for decision is a relatively narrow one of applying art. 89, § 7 (5), in a particular situation. Does the by-law so directly affect the landlord-tenant relationship, otherwise than "as an incident to an exercise of an independent municipal power," as to come within § 7 (5)? If it does, then the town had no power to grant by the by-law the civil powers of regulation to the board, unless authorized in advance to do so "by the general court" in accordance with the proviso in art. 89, § 7. If the by-law does not come within § 7 (5), the town may have had power to adopt the by-law. In practical effect, the question is whether the town had no power to enact the by-law without prior legislative authorization, or whether the Legislature (if it wishes to preclude or to regulate such local rent control provisions) must enact (either before or after the adoption of such local provisions) appropriate general legislation (see art. 89, § 8) forbidding or regulating the adoption of such by-laws. Plainly the Legislature, under art. 89, may forbid the enactment or control the form of such by-laws in some manner, without regard to whether such a by-law as is before us comes within § 7 (5).

6. It is suggested that rent control is, in its nature, a purely local function and that, therefore, a town by-law, even though it directly affects a principal aspect of the land-lord-tenant relationship, is incident to an exercise of an independent municipal power. Doubtless, under art. 89, § 6, a town possesses (subject to applicable constitutional provisions and legislation) broad powers to adopt by-laws for the protection of the public health, morals, safety, and general welfare, of a type often referred to as the "police" power. We assume that these broad powers would permit adopting a by-law requiring landlords (so far as legislation does not control the matter) to take particular precautions to protect tenants against injury from fire, badly lighted

common passageways, and similar hazards. Such by-laws, although affecting the circumstances of a tenancy, would do so (more clearly than in the case of the present by-law) as an incident to the exercising of a particular aspect of the police power.

Rent control, in a general sense, is for the purpose of providing shelter at reasonable cost for members of the public, a matter comprised within the broad concept of the public welfare. Rent control, however, is also an objective in itself designed to keep rents at reasonable levels. Is the attempt to achieve this objective to be viewed as merely incident to the exercise of the whole range of the police power, or does art. 89, § 7 (5), imply that the separate components of the police power are to be considered individually in determining whether the exercise of one of them enacts "civil law governing civil relationships except as an incident to an exercise of an independent municipal power"? The quoted vague language points, in our opinion, to viewing separately the various component powers making up the broad police power, with the consequence that a municipal civil law regulating a civil relationship is permissible (without prior legislative authorization) only as an incident to the exercise of some independent, individual component of the municipal police power. To construe § 7 (5) otherwise might give it a very narrow range of application.

We conclude that it would be, in effect, a contradiction (or circuitous) to say that a by-law, the principal objective and consequence of which is to control rent payments, is also merely incidental to the exercise of an independent municipal power to control rents. We perceive no component of the general municipal police power, other than the regulation of rents itself, to which such regulation fairly could be said to be incidental.[6]

---

[6] Under art. 89, as authorities already cited suggest, it may make slight difference whether a particular power is inherently general or local. See e.g. 44 Natl. Municipal Rev. 137, 142. If, however, this issue has significance, it cannot be said that rent control has only local consequences. Whether an emergency exists in one community may be affected by conditions in neighboring areas. Regulation of rents in one community may have impact else-

357 Mass. 709 719

Marshal House, Inc. *v.* Rent Review & Grievance Board of Brookline.

7. Cases in other jurisdictions under different constitutional or charter home rule provisions, or under different statutory situations, are not controlling. In *Warren* v. *Philadelphia*, 382 Pa. 380, 384, local exercise of rent control was permitted under the broad provisions of a home rule act, largely comparable to art. 89, § 6, but subject to no such exclusion as appears in art. 89, § 7 (5). In *Heubeck* v. *Mayor & City Council of Baltimore*, 205 Md. 203, 207–211, a rent control ordinance was held inconsistent with a statute of general application, even though there appeared to be no such exclusion as is found in art. 89, § 7 (5). In *Old Colony Gardens, Inc.* v. *Stamford*, 147 Conn. 60, 63, charter provisions conferred "in general terms the power to protect the public health, safety, and welfare." It was said, "It does not necessarily follow, however, that a delegation of police power in general terms . . . to a municipality includes authority to impose rent controls." In circumstances (pp. 63–64) outlined in the opinion, the Connecticut court concluded that local rent regulation was "contrary to the public policy of the state as declared in state legislation." See *Tietjens* v. *St. Louis*, 359 Mo. 439, 444–446 (no power to regulate rents delegated to the city, even as incidental to other powers); *Wagner* v. *Mayor & Municipal Council of Newark*, 24 N. J. 467, 474–480.

8. We apply the ambiguous exclusion in art. 89, § 7 (5), in accordance with what appears to us to be the most probable meaning of the words of the exclusion, interpreted with reasonable breadth, as the nature of each other exclusion indicates should be done. In particular, we hold that § 7 (5) prevents the adoption of local rent control by-laws in the absence of an explicit delegation to municipalities by the Legislature of power to engage in such regulation of the

where on land use, new housing construction, the mortgage market, conveyancing practices, the adequacy and use of recording systems, and other similar matters. Various considerations might reasonably lead the Legislature, if it deals with rent control, (a) to impose general restrictions and conditions on local rent control, and (b) to take into account circumstances in more than one community in determining the existence of an emergency permitting legislation and the form of such legislation.

landlord-tenant relationship. Despite the severability provision of the by-law (§ 9) we view § 3 (f) concerning the filing of information, and § 3 (e) concerning rent level studies by the board, as subsidiary to and preliminary to the exercise of the general powers to control rents. These sections thus fall for the same reasons as the rent control sections of the by-law.

9. We have no occasion now to consider what action the Legislature may take under its general powers and under art. 89, § 8, to authorize action by the town. We assume that the Legislature, if it wishes to do so, may make an explicit and appropriate delegation of authority to a town or city to enact rent control provisions, in accordance with and subject to specified statutory standards. In view of our decision that the exclusion in art. 89, § 7 (5), is applicable, we need not discuss Marshal House's contention that local action in any event is prevented by art. 47 of the Amendments (declaring that in times of emergencies "the providing of shelter" is a public function, and giving to municipalities power to "provide the same for their inhabitants in such manner as the general court shall determine").

10. A declaration is to be made that the by-law (art. XXV) is invalid. The interlocutory decree is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*