HERBERT T. FLYNN & others[1] vs. CITY OF CAMBRIDGE
& others.[2]

Middlesex. January 8, 1981. — March 12, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & LIACOS, JJ.

Constitutional Law, Rent control. Rent Control. Municipal Corpora-
tions, Rent Control. Real Property, Condominium.

Chapter 36 of the Acts of 1976, which authorized the city of Cambridge to
control rents and evictions in rental housing units, conferred by im-
plication the power to control removal of units from the rental housing
market and thus provided authority for the enactment of an ordinance
regulating eviction from and condominium conversion of housing sub-
ject to rent control. [156-159]
A city ordinance which denied the owner of a condominium the right to
occupy his unit if it was used for rental housing on the effective date of
the ordinance did not constitute an unconstitutional deprivation of
property without compensation. [159-161]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 9, 1979.

The case was heard by Mulkern, J.

The Supreme Judicial Court granted a request for direct
appellate review.

Robert E. Keane (William Walsh with him) for the plain-
tiffs.

Hans F. Loeser (Stephen B. Deutsch with him) for the de-
fendants.

---

[1] Ten or more individuals stipulated to be registered voters of Cam-
bridge and owners of Cambridge realty subject to the challenged or-
dinance.

[2] Named individuals who are members of the rent control board of the
city of Cambridge. As interveners, the Cambridge Committee of Elders,
Inc., and eight citizens of Cambridge who reside in apartments owned by
one of the plaintiffs.

*Lauren P. Curry* for Cambridge Committee of Elders, Inc., & others, interveners.

*John Niles, Kenneth J. Mickiewicz & Nathanael R. Brayton*, for Cambridge Property Owners Association, Inc., amicus curiae, submitted a brief.

HENNESSEY, C.J.  The plaintiffs contest the legal power and authority of the Cambridge city council to enact c. 23 of the Code of the City of Cambridge, Ordinance 926 (ordinance), an ordinance regulating eviction from and condominium conversion of housing subject to rent control (controlled rental units).  They contend that, even if the ordinance was properly enacted, it so restricts the uses for which their units may be utilized as to amount to an unconstitutional taking of their property.  We uphold the validity of the ordinance.

The plaintiffs filed a complaint in the Superior Court on November 9, 1979, seeking a declaration that the ordinance was invalid.  They alleged that they were irreparably injured by the operation of the ordinance and sought a preliminary injunction against its enforcement.  On December 21, 1979, the Superior Court judge denied the application for a preliminary injunction.  On January 17, 1980, the Cambridge Committee of Elders, Inc., and eight tenants of apartments owned by individual plaintiffs, were allowed to intervene as defendants.  The parties filed a stipulation and statement of agreed facts on January 30, 1980, and the parties thereafter filed briefs and participated in oral argument.  On May 13, 1980, the judge ordered that final judgment be entered in favor of the defendants and that a declaration issue that Cambridge properly complied with all applicable procedural requirements in adopting the ordinance, that its adoption was a lawful exercise of Cambridge's power, that the ordinance is constitutional and valid on its face and does not unlawfully infringe upon the rights of the plaintiffs, is a lawful regulation of controlled rental housing units in Cambridge, is fully effective within Cambridge and may be enforced by the Cambridge rent control board (board).  The plaintiffs duly appealed to the

Appeals Court and the defendants subsequently filed an application for direct appellate review in this court, which was granted on September 18, 1980.

The pertinent facts stipulated are as follows. Prior to the enactment of the ordinance on August 13, 1979, rents and evictions in Cambridge were controlled pursuant to c. 842 of the Acts of 1970 (c. 842).[3] Chapter 842 was a Statewide general enabling act allowing the regulation of rents and evictions in a substantial number of rental housing units in Cambridge. After being extended for one year by c. 851 of the Acts of 1975, it expired on April 1, 1976. This general enabling act was supplanted by c. 36 of the Acts of 1976 (c. 36). Chapter 36 is a special act entitled "An Act enabling the city of Cambridge to continue to control rents and

---

[3] Chapter 842 of the Acts of 1970 was passed by the Legislature following our decision in *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline*, 357 Mass. 709 (1970). In *Marshal House* we held that Brookline could not enact a rent control by-law under its home rule powers because the challenged by-law was a civil law affecting a civil relationship, *id.* at 716-717, and rent control was not incident to an independent municipal power, *id.* at 717-718. After c. 842 (a general enabling act) subsequently conferred the power to regulate rents and evictions, Brookline then restricted condominium conversions by regulations promulgated by its rent control board. We held that the Brookline rent control board was without authority to enact such regulations, because the regulations contradicted the policy of c. 842 to encourage home ownership. *Zussman* v. *Rent Control Bd. of Brookline*, 367 Mass. 561, 566-567, 569 (1975). A special rent control statute, St. 1970, c. 843, was thereafter interpreted by Brookline as authorizing the implementation of rent and eviction controls. The special authority conferred on Brookline by c. 843 was not limited by the policy of encouraging home ownership which we found in the general act, c. 842. This special authority was used by the town to regulate condominium conversion by by-law amendments. These amendments were upheld in *Grace* v. *Brookline*, 379 Mass. 43 (1979). In *Grace* we observed that c. 843 evidenced the Legislature's realization that a unique problem existed in Brookline, and that the policy of encouraging home ownership that we found in c. 842 was absent from c. 843, *id.* at 50-51. We note here that this policy is also missing from, or at most secondary in, the legislation challenged in this case. St. 1976, c. 36, § 9(a)(10). See generally Schlein, Government Regulation of Condominium Conversion, 8 B.C. Envt'l Aff. L. Rev. 919, 925-937 (1980).

evictions." The ordinance whose validity is challenged here is entitled "Regulations pertaining to controlled rental housing units." Following an emergency preamble, the ordinance states that "[i]n order to carry out the purposes of [c. 36] . . . it is necessary for the Cambridge City Council, in the exercise of its powers under section 6 of the Home Rule Amendment and under section 5 (*c*) of [c. 36], to regulate the removal of controlled rental housing units from the market." Thus the ordinance claims legitimacy from at least two sources, and the judge below found that both c. 36 and the Home Rule Amendment provided authority for the enactment of the ordinance. We do not examine the Home Rule Amendment since we find implicit authority in c. 36 which empowers Cambridge to enact the ordinance.

The plaintiffs claim that the ordinance amounts to a taking of their property since in some circumstances an owner of a condominium will be prohibited from occupying his unit. The ordinance prohibits the removal of any controlled rental unit unless the city rent control board issues a permit. The permit requirements and related provisions of the ordinance are set forth in the margin.[4] "Removal from

---

[4] "(d) *Considerations.* In deciding whether to grant a permit under this section, the board shall consider:

"(1) the benefits to the persons sought to be protected by the Act and by this section;

"(2) the hardships imposed on the tenants residing in the unit proposed to be removed, including any mitigating provisions made by the applicant; and

"(3) any aggravation of the shortage of decent rental housing accommodations, especially for families of low and moderate income and elderly people on fixed incomes, which may result from the removal.

"(e) *Effectiveness.* This section shall take effect immediately, but shall cease to be effective if the board files its certificate with the city clerk that:

"(1) the vacancy rate in the total supply of controlled rental [housing] exceeds four percent, or

"(2) the total number of rental units in the city excluding public

the market" is defined in § 1 (b) (4) (i) of the ordinance as including occupation by an owner of a controlled rental unit which is a condominium, if the last previous occupant was a tenant. However, if the "last previous occupant" purchases the condominium, the ordinance then permits him to occupy his unit. In addition, the ordinance does not apply if a purchase and sale agreement was entered into or a unit deed recorded prior to August 10, 1979. In essence, what the ordinance does is require that any unit which is a controlled rental unit on August 10, 1979, remain part of the rental housing stock of the city of Cambridge. It does not prevent an owner from converting his controlled rental units into condominiums, but it does prohibit those condominiums from being used for purposes other than rental housing.

I. *The Authority of the City Council to Enact Ordinance 926.*

The declaration of emergency in § 1 (a) of the ordinance states: "[a] serious public emergency continues to exist in the City of Cambridge with respect to the housing of a substantial number of its citizens, as declared by Chapter 36 of the Acts of 1976, for the reasons stated in the Act. The emergency has worsened since 1976 because of the removal of a substantial number of rental housing units from the

---

housing units, exceeds that number as of January 1, 1970.
"If such a certificate ceases to be correct, the board shall withdraw it by filing a new certificate, and this section shall then again be effective until one of the above conditions again prevails.

"(f) *Penalty.* Any person who violates this section shall be punished by a fine of not more than five hundred dollars. The removal of each unit shall constitute a separate violation."

The board has promulgated regulations in order to implement these and other provisions in the ordinance. The plaintiffs have referred at length to these regulations, suggesting that they seek a judgment regarding the validity of the regulations. Having challenged only the facial validity of the ordinance, however, they are not entitled to such a ruling. Moreover, any attack on the validity of the regulations would have to be brought in the District Court, rather than the Superior Court where the plaintiffs commenced this action. *Marshal House, Inc.* v. *Rent Control Bd. of Brookline,* 358 Mass. 686, 707-709 (1971). Section 10 of c. 36 of the Acts of 1976.

market by condominium conversion, demolition, and other causes." The plaintiffs do not contest that the city council could reasonably have made these findings, and they likewise do not contest that the city council could reasonably have concluded that the challenged provisions of the ordinance would alleviate these conditions. In the declaration of emergency in § 1 of c. 36, the Legislature found that "unless residential rents and eviction of tenants are regulated and controlled, such emergency and the further inflationary pressures resulting therefrom will produce serious threats to the public health, safety and general welfare of the citizens of Cambridge . . . ." Chapter 36 itself provides restrictions on evictions from controlled rental units, and it expressly states that "[r]ecovery of possession in order to convert an apartment unit to a condominium unit shall not be a valid reason to recover possession of a controlled rental unit." § 9 (*a*) (10). The ordinance provides additional restrictions, all consistent with c. 36.[5] The plaintiffs' contention, though, is that the city council lacked authority to enact the ordinance.

It is beyond question that c. 36 enables Cambridge to control rents and evictions. In addition to the express powers[6]

---

[5] The plaintiffs contend that certain provisions in § 9 of c. 36 which, they claim, detail evictions which must be approved, conflict with parts of the ordinance which make those same evictions subject to board discretion. This apparent conflict, however, is eliminated by § 9 (*e*): "The provisions of this section shall be construed as additional restrictions on the right to recover possession of a controlled rental unit. No provision of this section shall entitle any person to recover possession of such a unit."

[6] Section 5 (*c*) of c. 36, the section defining the powers of the rent board, expressly authorizes the board to "recommend to the city, for adoption, such ordinances as may be necessary to carry out the purposes of this act." The plaintiffs view this as a limitation of the city council's power to enact ordinances, restricting the council to consideration of only those ordinances approved by the board. The city, on the other hand, views this language as recognition of the council's power to enact ordinances. It would be absurd, says the city, for the board to recommend an ordinance if the council was without power to enact it. In light of our holding that the city has implicit power to enact necessary ordinances, it is sufficient for us to find that this language operates neither as a restriction on nor a grant of power to the city. We read this language only as an express grant of power to the board to recommend ordinances.

conferred by c. 36, however, certain powers are implied. When analyzing a grant of power to a municipal government we must keep in mind that "a grant of an express power carries with it all unexpressed, incidental powers necessary to carry it into effect." 3 C. Sands, Sutherland Statutory Construction § 64.02 (4th ed. 1974). This doctrine has been applied, albeit in a slightly narrower fashion, in earlier cases in the Commonwealth. See *Higginson* v. *Treasurer & School House Comm'rs of Boston*, 212 Mass. 583, 585 (1912); *Cambridge* v. *Commissioner of Pub. Welfare*, 357 Mass. 183, 185 (1970). It appears that this doctrine has been expanded in its recent applications in other jurisdictions. See generally *Triangle Oil, Inc.* v. *North Salt Lake Corp.*, 609 P.2d 1338 (Utah 1980) (cities have powers expressly set forth and those necessarily implied therefrom which are essential to carrying out duties and purposes of city government); *Port of Seattle* v. *Washington Utils. & Transp. Comm'n*, 92 Wash. 2d 789 (1979) (in addition to those powers necessary or fairly implied in or incident to express powers, grant of power includes those powers essential to the declared objects and purposes of municipal corporation); *Hinesburg Sand & Gravel Co.* v. *Hinesburg*, 135 Vt. 484 (1977) (municipality has those powers and functions specifically authorized by Legislature as well as such additional powers and functions as may be incident, subordinate or necessary to exercise of express powers). In order to determine whether the city council was empowered by c. 36 to enact the ordinance, we must decide whether the city's ability to regulate the removal of rental housing stock from the market is an "unexpressed, incidental power necessary to carry [c. 36] into effect." We conclude that it is.

If the power to control rents is to be anything more than an interim measure effective for only the short period needed to convert the entire rental housing stock, it must include by implication the power to make reasonable regulations governing removals from the rental housing market. "It is no coincidence that many cities facing the most serious conversion problems are rent controlled cities, and as the rent

control movement spreads, condominium problems are likely to follow." Comment, The Condominium Conversion Problem: Causes and Solutions, 1980 Duke L.J. 306, 312. In 1979 there were 20,115 controlled rental units in Cambridge. In the seven-year period 1970 to 1976, inclusive, condominium master deeds were filed with respect to a total of 445 residential rental units. The conversion rate escalated, however, from January 1, 1977, to August 13, 1979, the effective date of the ordinance. In this thirty-one month period condominium master deeds were filed with respect to 1,554 residential units: 80.6 per cent of these units were subject to rent control. Thus, immediately prior to the passage of the ordinance, conversion of controlled rental housing was sharply reducing the supply of affordable rental housing in Cambridge, housing which c. 36 was expressly designed to conserve. Even if the conversion rate did no more than level off, the power conferred by c. 36 to control rents would steadily and irreversibly be transformed into the power to control nothing. The power to control rents and evictions is not so illusory that it does not comprehend the right and responsibility of preventing removals from its reach. We conclude that the power to control removals from the rental housing market is essential to the operation of c. 36, and is therefore conferred by implication in the rent control statute.

II. *The Constitutionality of the Ordinance.*

The plaintiffs contend that the ordinance is unconstitutional because it eliminates an owner's right to possess his condominium unit, and the owner is not compensated for this deprivation. Such a deprivation, claim the plaintiffs, is unduly oppressive and arbitrary in its allocation of rights of possession to persons other than the owner. We do not agree.

The ordinance does deny a condominium owner the right to occupy his unit if it was used for rental housing on and not converted before the effective date of the ordinance. There are two classes of owners who are affected. The first class, those owners who purchase their condominium units

after the effective date of the ordinance, are on notice that they have no right to use their property as owner-occupied housing. They are fairly warned that they are purchasing property which may be used for rental housing only, and presumably the purchase price reflects this use restriction. Since these owners were notified that they had no right to occupy their unit, they were not denied a right to which they had a legitimate expectation. Clearly the government is not required to compensate an individual for denying him the right to use that which he has never owned.

The second class of owners is comprised of those owners whose units were purchased prior to, and which were being used for rental housing on, the effective date of the ordinance. These owners, under prior law, did have a right to occupy their unit. That right is now denied them. However, "the submission that [plaintiffs] may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. . . . 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, [the focus is] rather both on the character of the action and on the nature and extent of the interference with rights *in the parcel as a whole*" (emphasis added). *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 130-131 (1978). In *Penn Cent.* two factors persuaded the Court that no taking had occurred: the governmental action did not interfere with the owner's primary expectation concerning the use of the property, and the owner was still able to obtain a reasonable return on its investment. *Id.* at 136. The presence of these two factors in this case likewise convinces us that no taking has occurred. By definition, any owner in the second class of owners was using his unit for rental housing on the effective date of the ordinance, so his primary expectation has not been frustrated. While the use restrictions subsequently enacted undeni-

ably diminish the value of the property, this alone does not establish a taking. See *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 (1926); *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 413 (1922). In addition, the owner of a controlled rental unit is *assured* by § 7 (*a*) of c. 36, of the right to receive a fair net operating income for his unit. It is not disputed that the ordinance serves a legitimate public purpose. We conclude that there has been no taking. In similar cases, analysis of the factors that we have considered herein has led to identical conclusions. See, e.g., *Agins* v. *Tiburon*, 447 U.S. 255, 261 (1980); *Andrus* v. *Allard*, 444 U.S. 51, 64-68 (1979); *Penn Cent. Transp. Co.* v. *New York City*, 438 U.S. 104, 136 (1978).

*Judgment affirmed.*