ALEX STEINBERGH & another,[1] trustees,[2] *vs.* RENT CONTROL BOARD OF CAMBRIDGE & others.[3]

Middlesex. October 4, 1989. - November 20, 1989.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Municipal Corporations*, Rent control. *Real Property*, Condominium. *Rent Control*, Removal of unit from market. *Cambridge.*

The city council of Cambridge exceeded the authority conferred on it by St. 1976, c. 36, when it adopted an amendment to the city's rent control ordinance providing that no owner of a controlled condominium unit or units may sell less than his entire interest in such unit or units without first obtaining a removal permit from the rent control board. [149-155]

CIVIL ACTION commenced in the Superior Court Department on October 9, 1987.

The case was heard by *Edward M. Ginsburg*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Frederick B. Hayes, III*, for the plaintiffs.

*Patricia A. Cantor* (*Carol Wagner* with her) for Rent Control Board of Cambridge.

*James M. Shannon*, Attorney General, *Robert L. Bowens, Evelynne L. Swagerty & Harvey D. Cotton*, Assistant Attorneys General, for the Commonwealth, amicus curiae, submitted a brief.

*Philip S. Lapatin*, for Greater Boston Real Estate Board, amicus curiae, submitted a brief.

*Jeffrey W. Purcell*, for Massachusetts Tenants Organization & another, amici curiae, submitted a brief.

---

[1]R. Stanley Bowden.

[2]Of Sixteen Chauncy Trust.

[3]The residents of the building at 16 Chauncy Street in Cambridge.

GREANEY, J. The plaintiffs, trustees of a fifty-three unit building at 16 Chauncy Street in Cambridge which has been converted to condominium units, appeal from a summary judgment of the Superior Court. That judgment upheld a decision of the rent control board of Cambridge (board) which determined that sales of individual condominium units within the building are subject to subsection c½ of § 1[4] of Cambridge Ordinance 966 which regulates the "Removal of Controlled Rental Units from Market" (hereafter subsection c½). The plaintiffs make several arguments that subsection c½ is invalid. We agree with their contention that subsection c½ exceeds the board's authority in the rent control area, and, as a consequence, is invalid. This conclusion renders it unnecessary to consider the other points argued.

This litigation is the latest in a long series of disputes surrounding the establishment and operation of rent control ordinances in various communities of the Commonwealth. See, e.g., *Perry v. Boston Rent Equity Bd.*, 404 Mass. 780 (1989); *Greater Boston Real Estate Bd. v. Boston*, 397 Mass. 870 (1986); *Bannerman v. Fall River*, 391 Mass. 328 (1984); *Flynn v. Cambridge*, 383 Mass. 152 (1981); *Grace v. Brookline*, 379 Mass. 43 (1979). The instant chapter begins

---

[4]This specific provision is entitled "Prohibited acts by developers" and reads as follows:

"After August 1, 1981, no owner of a building for which a condominium master deed has been recorded shall directly or indirectly sell, or offer for sale, or agree to sell any controlled rental unit therein, unless the Board has granted a removal permit for that unit, or unless the sale or offer is to, or the agreement is with, a current tenant of the unit who holds an exemption certificate. The Board shall issue an exemption certificate to any person who files with it an affidavit in a form prescribed by the Board, stating that he is a current tenant of the unit, that he occupied it as a tenant before August 10, 1979, and that he intends in good faith to occupy it indefinitely as its owner. No person shall file a false affidavit under this subsection. Nothing in this subsection shall prevent an owner of a building or any portion thereof from conveying his entire interest in the building in good faith to one purchaser, who shall then be subject to the provisions of this subsection to the same extent as the original owner."

with the enactment of St. 1976, c. 36 (Rent Control Act), a special statute which granted Cambridge the power to continue controlling rents and evictions.[5]

After several years of rent and eviction controls had apparently proven insufficient to preserve its stock of affordable rental housing, Cambridge turned its attention toward regulating removal of controlled units from the rental housing market. In 1979, the city council of Cambridge (city council) adopted § 1 of c. 23 of the Cambridge City Code, Ordinance 966 (ordinance). Section C of the ordinance provides that "[n]o owner or other person shall remove from the market any controlled rental unit, unless the Board after a hearing grants a permit." "Removal from the market" is defined to include occupancy of a controlled condominium unit by its owner, if the last previous occupant was a tenant. *Id.* at § b (4)(i). Thus, the ordinance generally prevents the legal owner occupancy of controlled condominium units in Cambridge.

In *Flynn* v. *Cambridge*, 383 Mass. 152 (1981), we upheld the ordinance against a challenge that Cambridge lacked the authority to adopt it. While we implicitly found that St. 1976, c. 36, did not provide express authority for removal provisions such as those set forth in the ordinance, we held that the grant of express powers in that statute carried with it a grant of those implied powers necessary to effectuate the statutory goals. One such implied power is the ability to regulate removal of controlled units from the rental housing market. Without this implied authority, we reasoned, "the power conferred by c. 36 to control rents would steadily and irreversibly be transformed into the power to control nothing." *Id.* at 159. We thus held that the power to regulate

---

[5]Cambridge first enacted rent and eviction control ordinances based upon the authority conferred by St. 1970, c. 842. That statute, which applied to all cities and towns with populations in excess of 50,000, lapsed in 1976, and was not renewed. The Legislature, reacting to its perception that "a serious public emergency exists with respect to the housing of a substantial number of the citizens in the City of Cambridge," then enacted St. 1976, c. 36.

removals from the rental housing market was conferred by implication in the Rent Control Act. *Id.*

Despite the strict removal regulations imposed by the ordinance, the city council concluded that the city's housing stock still was not adequately protected. In particular, widespread owner occupancy of controlled condominium units was said to exist, in direct violation of the ordinance. In an attempt to remedy this perceived problem, the city council amended the ordinance on June 29, 1981, by adding subsection c½, the provision at issue in this case. The amendment provides that no owner of a controlled condominium unit or units shall sell anything less than his or her entire interest in such unit or units without first obtaining a removal permit from the board.[6] Subsection c½ appears to rest on an assumption that sales of individual condominium units inevitably result in illegal owner-occupancy of those units.

The plaintiffs desire to sell less than all of their fifty-three units at 16 Chauncy Street to individual investors. They requested a decision from the board stating that their property was exempt from subsection c½. After conducting an inquiry, a hearing examiner recommended that the plaintiffs' request be denied. The board accepted this recommendation, and concluded that the plaintiffs' units could not be individually sold.

The plaintiffs appealed to the Superior Court pursuant to St. 1976, c. 36, § 10 (judicial review provision of Rent Control Act). After stipulating that there were no genuine issues of material fact, the parties each moved for summary judgment pursuant to Mass. R. Civ. P. 56, 365 Mass. 824 (1974). The Superior Court judge granted the board's motion.

We discern merit in the plaintiffs' argument that the city council lacked authority to adopt subsection c½. Like any other municipality in this Commonwealth, Cambridge may

---

[6]Subsection c½ also permits sales of less than an owner's full interest if the buyer is a current tenant who has occupied the unit since August 10, 1979, and who holds an exemption certificate. This exception is not relevant to the facts in the case and does not affect our analysis of the appeal.

exercise only those powers which have been affirmatively granted to it. See *Atherton* v. *Selectmen of Bourne*, 337 Mass. 250, 255-256 (1958). See also O.M. Reynolds, Local Government Law, § 49, at 135-136 (1982). Thus, in order for subsection c½ of the ordinance to be upheld as valid, there must be some positive law source authorizing its adoption.

The board relies primarily on the Rent Control Act, as providing the authority necessary to support the adoption of subsection c½.[7] We previously have held that the ordinance can be supported only by implied authority granted in the Rent Control Act. See *Flynn* v. *Cambridge, supra.* Thus, subsection c½, an amendment to the ordinance, can be supported, if at all, only by implication from the authority conferred by the Rent Control Act.

The standard we must apply in determining whether authority to adopt subsection c½ is to be implied from the Rent Control Act is straightforward: such power exists only if it is "necessary" to carry out the purpose expressed in the authorizing statute. See *Flynn* v. *Cambridge, supra* at 158; *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870, 877 (1986). This standard appears in the Rent Control Act itself. See St. 1976, c. 36, § 5 (c) ("[t]he rent control board . . . shall recommend to the city, for adoption, such ordinances as may be necessary to carry out the purposes of this act"). Thus, subsection c½ can be upheld as a valid exercise of implied statutory authority only if restrictions on piecemeal sales of controlled condominium units are reasonably necessary to the preservation of the affordable rental housing stock in Cambridge.

Turning directly to the question presented, we have little trouble in concluding that the regulatory mechanism established in subsection c½ is not necessary to the achievement of rent control objectives. We note initially, and most impor-

---

[7]The board does not seem to rely on the Home Rule Amendment, art. 89 of the Amendments to the Massachusetts Constitution, as Cambridge did in defending the ordinance in the *Flynn* decision. *Id.* at 155. Consequently, we have no occasion to address any home rule issues.

tantly, that subsection c½ does absolutely nothing to change the rent control status of units whose sale it regulates. The plaintiffs, for example, own a structure containing fifty-three controlled condominium units. Those units are now controlled, and will remain subject to the exact same controls regardless whether they are sold off as a block, individually, or anywhere in between. Subsection c½ creates no change in legal status of the units to which it applies, let alone a change that can be deemed "necessary" to the furtherance of rent control objectives. Rather, it merely sets up another regulatory obstacle which owners must overcome before they legally may alienate their property.

The board sets forth eight reasons in support of its contention that subsection c½ is necessary to achieve the objectives of rent control. Of those eight, we find only two which possibly could support the rationale the board seeks: (1) that "[b]y allowing a court to enjoin illegal sales, offers, and agreements, [subsection c½] provides a meaningful civil remedy short of an order requiring an owner-occupant to vacate," and (2) that subsection c½ "simplifies and reduces the cost of enforcement by limiting proof of violation to the recording of an initial unit deed after July 1, 1981, without the issuance of either a removal permit or an exemption certificate."[8] These claims amount to an assertion that the extra layer of regulation added by subsection c½ is absolutely necessary to facilitate the effective enforcement of other provisions of the ordinance.

We regard this "ease of enforcement" claim with suspicion, because we deem it an attempt by the board to extract a second level of derivative powers from the language of the

[8]The remaining six reasons put forth by the board — that subsection c½ (1) does not further hurt condominium owner occupancy; (2) imposes a reasonable liability on developers; (3) protects innocent purchasers against unscrupulous developers; (4) clears future titles on resale; (5) prevents harassment of older and poorer tenants; and (6) prevents fragmented ownership of rental housing — are either at best only minimally relevant to the goals of the Rent Control Act or lack adequate substantiation in the record before us. We do not consider any of them sufficient to sustain subsection c½.

Rent Control Act. The power to regulate removal at all, it will be recalled, is derivative of the power to regulate rents and evictions expressly granted in the Rent Control Act. The board now would have us hold that they also possess additional implied authority to enforce a power that is itself a creature of implication. This, we conclude, impermissibly extends the legislative grant of power in the Rent Control Act beyond what its language reasonably will bear.

Furthermore, even if we were persuaded that enforcement considerations must furnish some basis for upholding subsection c½, we are not convinced that the alleged enforcement advantages are so significant that they outweigh the interest of the owner in transferring ownership of his condominium to an investor. The crux of the board's argument is that subsection c½ enables them to determine in advance whether a proposed condominium sale is likely to result in illegal owner occupancy. To obtain the required removal permit, a potential buyer would have to appear before the board and convince it that his intention to maintain the unit as rental property was bona fide. If the board was not convinced, it simply would deny the required permit, and monitor the local registry of deeds to ensure that the proposed sale was not consummated.

A close analysis of this argument reveals that subsection c½ actually produces little incremental enforcement advantage. First, the investigative forum provided by the removal permit hearing already is available under other provisions of the ordinance. The board is empowered to conduct hearings, to subpoena witnesses and documents, and to require any owner or landlord to furnish under oath any information or records the board deems necessary. See ordinance, § 1 (5) (d). Subsection c½, for the most part, merely replicates these preexisting enforcement mechanisms. Second, the alleged advantage of having a "new" remedy —the power to enjoin an illegal condominium sale before it occurs — is not reasonably "necessary" to fulfil the aims of the Rent Control Act. The board already has at its disposal the power to seek fines of $500 a day, or imprisonment for up to ninety days,

against both illegal owner-occupiers and persons who knowingly supply it with false testimony or documents. See ordinance, § 12 (c). Furthermore, the board may seek civil damages, injunctive, or declaratory relief against violators of the ordinance. See ordinance, § 11 (d). It is unreasonable to suggest that simply because violations might be continuing to occur despite this panoply of powerful enforcement mechanisms, a new remedy, of a drastic nature, is "necessary" to save the rent control experiment from failure. It appears to us that the more likely solution lies in more effective utilization of existing enforcement procedures.

Our conclusion in this case follows logically from our earlier holding in *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870 (1986). In the *Greater Boston* decision, we invalidated a Boston ordinance that banned the sale of controlled rental units to investors who had not first obtained a removal permit.[9] Like subsection c½, the Boston ordinance rested on implied rather than express powers, and thus, to be valid, was required to be "essential and not merely convenient to the implementation of express powers conferred by

---

[9]The board attempts to distinguish the Boston ordinance by noting that, unlike subsection c½, it required that removal permits be granted to any purchaser seeking to occupy a unit as owner and denied permits to any investor who planned to continue renting the unit. This fact, the board contends, explains the *Greater Boston* court's inability to find any logical nexus between the Boston ordinance and the goals of rent control.

We acknowledge this factual distinction between the two ordinances, but do not consider it legally relevant. As we noted in the *Greater Boston* decision, the issue presented was "whether the city has the authority to bar [sales to investors], *including those that do not involve the eviction of tenants nor the actual removal of rental dwelling units from the market*" (emphasis added). Id. at 874. Like Boston, Cambridge is attempting to regulate the sales of rental units, even when such sales result neither in evictions nor in removal of units from the rental housing stock. And while the procedure selected by Cambridge is a removal permit requirement rather than an outright ban, the practical effect of the two is likely to be virtually identical. As was noted in the report of the committee on rent control to the Cambridge city council: subsection c½ "would tend to prevent future developer sales to such investors, because they would be unlikely to meet the current tests for removal of such apartments from the rent-controlled market."

statute." *Id.* at 877. In applying this standard, we concluded that the ordinance had only "minimal" logical connection to preserving Boston's rental housing stock since it prohibited investors "from obtaining permits necessary for condominium . . . transfers even in circumstances where no tenant is evicted and no unit is in fact removed from the rental market." *Id.* at 878. This reasoning applies with equal force to subsection c½. It follows from what has been said that Cambridge exceeded the authority conferred on it by the Rent Control Act when it adopted subsection c½ of the ordinance.

The judgment is vacated. A new judgment is to be entered setting aside the decision of the board because subsection c½ has been determined to be invalid, and adjudging that the plaintiffs' property at 16 Chauncy Street in Cambridge, while otherwise subject to the provisions of the Cambridge rent control and removal ordinances, is not subject to subsection c½ of the removal ordinance.

*So ordered.*