Zuker *v.* Cambridge.

EDWARD E. ZUKER, trustee,[1] *vs.* CITY OF CAMBRIDGE & another.[2]

No. 89-P-419.

Middlesex. September 10, 1990. - October 16, 1990.

Present: PERRETTA, DREBEN, & FINE, JJ.

*Municipal Corporations*, Rent control, By-laws and ordinances. *Rent Control*, Removal of unit from market. *Cambridge*.

The factual circumstances of a landlord's appeal from the Cambridge rent control board's denial of removal permits presented no occasion to consider the validity of section 1(b)(4)(iii) of the removal permit provisions of the Cambridge rent control ordinance. [387-388]

In circumstances where rent controlled apartments were lawfully vacant when the landlord undertook to make certain repairs and improvements not required by law, section 1(b)(4)(iii) of the Cambridge rent control ordinance did not apply, with the result that removal permits were not required before the work commenced. [388-390]

Where a landlord was not required under the Cambridge rent control ordinance to obtain removal permits before undertaking certain repairs and improvements to lawfully vacant rent controlled apartments, the rent control board had no basis for limiting the landlord's right to recoup the cost of the work through future rent adjustments. [390-391]

CIVIL ACTION commenced in the Superior Court Department on January 19, 1988.

The case was heard by *Edward M. Ginsburg*, J., sitting under statutory authority.

*James W. Murphy* for the plaintiff.

*Patricia A. Cantor* for the defendants.

FINE, J. This appeal concerns the right of a Cambridge landlord to make optional repairs to a vacant controlled rental unit without first obtaining a removal permit from the Cambridge rent control board (board).

[1]Of the West Hill Realty Trust.
[2]Rent control board of Cambridge.

To further the purposes of the Cambridge Rent Control Act, St. 1976, c. 36, the city adopted § 1 of c. 23 of the Cambridge City Code, Ordinance 966, to regulate the removal of controlled rental units from the housing market. The ordinance requires a landlord to obtain a permit from the board, after a hearing, before removing a rent controlled unit from the housing market. In addition to such acts as demolishing a unit, occupying a condominium or cooperative unit as owner, and refusing to rent for an extended period of time without good cause, section 1(b)(4)(iii) of the ordinance defines "removal from the market" to include the following: "rehabilitate, repair or improve, other than as required by the laws of the Commonwealth or the city, in such a way as to prevent residential occupancy during the course of the rehabilitation, repair or improvement. . . ."

In a complaint filed in the Superior Court, the plaintiff landlord challenged an order of the board based upon that subsection of the ordinance. The plaintiff contends that the order, issued after an adjudicatory hearing, penalized him for performing repairs to six vacant controlled rental units before applying for removal permits and should be set aside either because the board incorrectly construed the ordinance or because the ordinance is invalid. Based upon a review of the administrative record, a Superior Court judge ruled that the board's decision was supported by substantial evidence and correct as matter of law, and he entered judgment for the board. The plaintiff makes the same contentions on appeal as he made in the trial court. We agree with the plaintiff that the board misconstrued the ordinance and that the order must be vacated.

We take the facts as found by the board. The six units in question are in a thirty-eight unit building, of 1920's vintage, located at 19-21 Wendell Street. When each of the units became vacant the plaintiff undertook repairs, some of them required to conform to applicable sanitary code requirements and some of them optional. The required work generally included window repairs, installing new light fixtures and new kitchen plumbing, and repairing chipping and peeling paint

and damaged plaster. The optional work included replacing old and defective, but repairable, stoves and refrigerators, sanding wooden floors, replacing bathroom fixtures and tile, and installing new kitchen cabinets and new gas pipes for the stoves. The six units remained vacant as a result of the repair work for an average of five months. All are presently occupied by tenants, and they remain subject to rent control.

After the repair work had begun, the plaintiff applied to the board for a determination whether removal permits were required and, if so, for the granting of those permits. Tenants in other units in the building then complained to the board, requesting denial of the permits. A hearing officer conducted a lengthy hearing. He found that some of the work performed, even if of such a nature that it might have been undertaken by a reasonably prudent owner, was not necessary to bring the premises into conformity with the requirements of law. He found further, notwithstanding that the units had been vacated voluntarily before the repairs were undertaken, that the work "prevent[ed] residential occupancy," within the meaning of the ordinance. Because of his conclusion that removal permits should have been obtained before the optional work commenced, the hearing officer recommended that the plaintiff be precluded from recovering a substantial portion of his costs through future rent adjustments.[3] By a three to two vote, the board modified the hearing officer's findings and recommendation, but accepted his reasoning as to the applicability of the removal permit requirement and imposed a penalty limiting the plaintiff's right to recoup, through future rent adjustments, only forty percent of the cost of the work, except for the cost of plumbing and electrical work, which could be recouped in full.

---

[3]Section 72-13 of the board's regulations (1984) states that "[t]he Rent Control Board may deny any rent adjustment, or part thereof, pursuant to Regulation Series 72, 75 and 76, for the cost of rehabilitation, repair or improvement other than as required by the laws of the Commonwealth or the City, which prevent(s) reasonable residential occupancy during the course of the work, unless a removal permit has been granted pursuant to Ordinance 966."

As the board would construe the ordinance, it would be free, through the device of requiring a discretionary permit, to prevent a landlord from making any optional repairs to a vacant controlled unit. For example, the board could require a landlord to repair old appliances for a new tenant rather than replacing them and could require patching of multiple cracks in a ceiling instead of providing a new ceiling.

We discuss first the plaintiff's contention on appeal that Cambridge lacked the power to adopt the challenged portion of the ordinance as construed by the board. Whether the removal ordinance, so construed, would withstand a legal challenge would depend upon whether it was necessary to give the board that power in order to carry out the purposes of the rent control act. See *Flynn* v. *Cambridge*, 383 Mass. 152, 158 (1981); *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870, 877 (1986); *Steinbergh* v. *Rent Control Bd. of Cambridge*, 406 Mass. 147, 151 (1989). The goals of the Cambridge Rent Control Act relate to the maintenance of fair, reasonable and affordable rents, the quality and supply of rental housing, and the protection of tenants against eviction. In a challenge to the removal ordinance in a case involving its effects on condominium conversions, it was generally upheld as constitutionally valid and consistent with the over-all purposes of the Cambridge Rent Control Act. *Flynn* v. *Cambridge*, 383 Mass. at 156-161. (See also *Steinbergh* v. *Rent Control Bd. of Cambridge*, 406 Mass. at 148-150 [1989], describing the background of the adoption of the removal permit ordinance.) The court reasoned that unless the board could control the removal of housing from the rental market "the power . . . to control rents would steadily and irreversibly be transformed into the power to control nothing." *Flynn* v. *Cambridge*, 383 Mass. at 159. Whether the authority to regulate removals justifies the authority the board seeks to assert over temporary vacancies for repair work under § 1(b)(4)(iii) of the ordinance, a question not specifically addressed in the *Flynn* case, is problematic. Compare *Commonwealth* v. *Kapsalis*, 26 Mass. App. Ct. at 456, where the court left open a similar question. We need not

decide whether the ordinance is valid, however, because, in our view, § 1(b)(4)(iii), reasonably construed, is inapplicable to the facts of the present case.

Ordinarily, "[a]n agency's interpretation of a statute, under which it is vested with broad authority to effectuate the purposes thereof, is entitled to great weight . . . . Even if this principle applies to the interpretation of ordinances by municipal boards, it is nevertheless 'one of deference, not abdication, and courts will not hesitate to overrule agency interpretations of rules when those interpretations are arbitrary, unreasonable or inconsistent with the plain terms of the rule itself'" (citations omitted). *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 858-859 (1986) (finding regulation inconsistent with plain terms of removal ordinance). See also *Manning* v. *Boston Redev. Authy.*, 400 Mass. 444, 453 (1987); *Figueiredo* v. *Rent Control Bd. of Cambridge*, 26 Mass. App. Ct. 661, 664 (1988).

Examining the language of § 1(b)(4)(iii), we assume arguendo the board's first contention that the concept of repairs "other than as required by the laws of the Commonwealth or the city" is reasonably clear, and we do not question the board's finding that the work done by the plaintiff included repairs not "required." We do not accept the board's contention, however, that the provision cited governing the repair, rehabilitation, or improvement of units applies to vacant premises. The term "prevent residential occupancy" is capable of being read that way, but it may also be read, in context, as applying only if a unit is rented and tenant residents are actually prevented from occupying it while the work proceeds. In view of other portions of the ordinance, only in the latter situation would the board's legitimate concerns justify a removal permit requirement. As we read the ordinance, it does not permit a landlord to effect a temporary eviction of tenants to undertake repair work not required to make the premises habitable. The situation is quite different, however, if the unit in which the repairs are to be done is vacant. There is, in such circumstances, no temporary eviction. A prudent property owner might well want to use the occasion

of a vacancy between tenancies to make reasonable repairs, both in the interest of maintaining the property and for the benefit of the next tenant. Given the likely effects of inflation and other factors, it might be uneconomical in the long run for a landlord to limit the repair work done to what is required to meet minimal code requirements. In any event, the Legislature's stated goal of reversing the deterioration of the city's housing stock would be assisted only by allowing landlords some flexibility in making prudent but optional repairs to vacant units.

The board asserts that its interpretation of the language of § 1(b)(4)(iii) is reasonable and consistent with legislative goals both because of the time during which the units might have to be vacant between tenancies for the repairs and because of the increased rents likely to flow from optional repairs.

The board, of course, has an interest in preventing not only permanent removals but activities likely to cause units to remain vacant for prolonged periods. We do not think § 1(b)(4)(iii) of the ordinance is intended, or is needed, to address that concern. The ordinance makes no reference to the period of time in which the unit would be unavailable for occupancy. Under the board's interpretation, a removal permit might be required even if optional repairs would require keeping a vacant unit off the market for just a few days. A separate subsection of the ordinance deals specifically with temporary but prolonged periods between tenancies. Under § 1(b)(4)(v), "removals" also include "caus[ing] a unit . . . to be vacant for one hundred twenty (120) days or more by refusing to rent or to offer for rent said unit in good faith . . . . The existence of a vacancy for one hundred twenty (120) days or more, without a showing of good cause, shall constitute removal from the market."[4] Given the specific pro-

---

[4]The board considered the applicability of § 1(b)(4)(v) to the present case but found no violation because the units had been rented by the time of the hearing. Presumably, the performance of reasonable repairs would constitute "good cause." Thus, on our view that § 1(b)(4)(iii) does not apply to vacant units, a landlord may, without seeking a removal permit, undertake any repairs to a vacant unit so long as the vacancy lasts no more

vision in § 1(b)(4)(v) of the ordinance limiting the period of vacancies, it may be assumed that § 1(b)(4)(iii) was intended to deal with a different problem, namely, repairs to units occupied by tenants.

The board also has a legitimate interest in the effect of repairs on future rents. The board asserts that it is necessary that it have the power to prevent optional repairs, whether or not a unit is vacant, to assure a supply of affordable housing for persons of low and moderate income. *Mayo* v. *Boston Rent Control Administrator*, 365 Mass. 575, 579-580 (1974), on which the board relies, does emphasize the importance of maintaining a supply of affordable housing as one of the legislative goals underlying rent control. In the *Mayo* case, however, the court was considering whether a landlord could evict tenants in order to do substantial optional renovations. Other than in connection with evictions, there is nothing in the rent control act which would restrict a landlord to providing only the bare minimum in services or repairs. On the contrary, the Legislature expressed its concern about the deteriorating quality of rental housing. The board is not without remedies, apart from the removal ordinance, for effectively controlling rent increases caused by unreasonable repair work and unduly lavish improvements. See §§ 72-04 and 75-04(b) of the board's regulations. Through rent adjustment proceedings, the board may assure that rents do not reflect unreasonable expenditures by landlords. Compare *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 639-640 (1976).

We conclude that the reasons advanced by the board do not support its interpretation of the ordinance.[5] As the plaintiff's six units were vacant when the repair work commenced, there was no basis in the ordinance, as reasonably construed, to penalize the plaintiff for not having obtained removal per-

_____

than 120 days. For repairs which cause a longer vacancy and which exceed the work a prudent owner would do to maintain his property (i.e., no showing of "good cause") a removal permit would be required.

[5]Our analysis would also apply to § 72-13 of the board's regulations, which uses language identical to that of the ordinance.

mits. His activities did not diminish the supply of rental housing in Cambridge. As there is no contention that the plaintiff acted to maintain his property other than as a reasonably prudent property owner would, and as the board still has the authority to set reasonable rents which provide the plaintiff with no more than a fair net operating income, the goals of rent control in Cambridge are satisfied without the need for the board to consider whether to grant the plaintiff removal permits.

The judgment of the Superior Court is therefore reversed, and a new judgment shall be entered vacating the order of the Cambridge rent control board.[6]

*So ordered.*

---

[6]In separate proceedings, the board may set new rents based upon a consideration of the extent to which the repairs to the six units were reasonable for the purpose of maintaining the property. The board may not impose a penalty for failure to obtain removal permits in advance of the work or deny rent increases on the ground that the repairs were not required by building or other codes.