BARRY J. DWYER & others[1] vs. COMMISSIONER OF INSURANCE & others.[2]

Suffolk. February 15, 1978. — May 15, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Insurance*, Commissioner of Insurance. *Civil Service. Contract*, Collective bargaining contract. *State Administrative Procedure Act. Veteran.*

Under G. L. c. 26, § 7, authorizing the Commissioner of Insurance to "appoint and remove . . . a chief examiner and such additional . . . examiners . . . as the service may require," it was within the discretion of the Commissioner to remove from office forty-three examiners, including some who were military veterans, by reason of lack of work, and his statutory power was not supplanted by the terms of a collective bargaining agreement covering the examiners. [230-234]

Hearings conducted by the Commissioner of Insurance regarding the dismissal of forty-three examiners by reason of lack of work were procedurally sufficient to satisfy the civil service law, the State Administrative Procedure Act, and any constitutional requirements, and the Commissioner's decision to dismiss the examiners was based on substantial evidence. [234-236]

The dismissal of fifty of the fifty-four examiners employed in the Fraudulent Claims Board by the Commissioner of Insurance because of lack of work did not usurp the legislative function. [237]

CIVIL ACTION commenced in the Superior Court on August 5, 1975.

The case was heard by *O'Connor, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Jerry C. Effren & Richard J. Vita* for the plaintiffs.

*Mitchell J. Sikora, Jr.,* Assistant Attorney General, for the defendants.

---

[1] See the text below.

[2] The codefendants are John F. Kehoe and Robert A. Panora, individually and as members of the Fraudulent Claims Board.

*Galen S. Gilbert,* for the Civil Service Commission, amicus curiae, submitted a brief.

KAPLAN, J. Forty-three examiners, employed in the Fraudulent Claims Board (FCB) of the Division of Insurance, were dismissed by the Commissioner of Insurance after hearings. They brought suit in the Superior Court against the Commissioner and others for an order of reinstatement with award of back pay. The suit can be read variously as a civil action in the nature of mandamus (G. L. c. 249, § 5), an appeal under the State Administrative Procedure Act (G. L. c. 30A, § 14), and a claim based on a collective bargaining agreement covering these examiners. A judge of the Superior Court considered the suit in all its phases after a hearing at which he received transcripts of the proceedings before the Commissioner with accompanying exhibits, together with a statement of agreed facts. In a thorough opinion, he held against the examiners' contentions and entered judgment dismissing their complaint. The examiners appealed, and we granted direct appellate review. We affirm.

From the findings of the judge, supplemented by references to the materials before him, we learn the following. FCB was created in 1968 as a board within the Division of Insurance. G. L. c. 26, § 8B, inserted by St. 1968, c. 643, § 1. Its purpose was to investigate frauds in motor vehicle accident claims with the object of reducing payments by the insurance companies and thereby lowering insurance premiums charged to the public.[3] Insurance companies filed with FCB reports of all motor vehicle accident claims, indicating

---

[3] Section 8B, as amended by St. 1970, c. 792, provides in part: "The board shall have authority to investigate all claims alleging loss or damages arising out of the ownership, operation, maintenance or use of a motor vehicle anywhere within the commonwealth, filed by a claimant against any person insured by an insurance company which has issued a policy of insurance providing protection or indemnity to the insured owner and to any other person operating, maintaining or using the motor vehicle with the consent, express or implied, of the insured; and any other claim covered by insurance resulting from the operation of a motor vehicle."

on the forms which claims appeared suspicious and warranted investigation for fraud. FCB would then carry out investigations.

FCB had some early success in its work: in 1970, 900 claims referred to it were withdrawn by the claimants. But with the advent of "no fault" automobile insurance, and the consequent near-disappearance of the relatively minor personal injury claims with which FCB had been dealing, the number of referred claims declined greatly (from 2,673 in 1970 to 585 in 1974), and the number of such claims withdrawn fell to seventeen for the twelve months ending March, 1975.

In spring, 1975, the Commissioner directed the first deputy commissioner to conduct a study of FCB. This official proceeded to interview the senior supervisory personnel of FCB and the claims managers of several large insurers; he assembled the FCB statistics and read its periodic reports and other such documentation; and he went into the details of many sample cases. The lengthy report of the deputy commissioner, filed on April 15, 1975, documented the decline in FCB's work. It noted that in the face of this shrinkage FCB had taken upon itself the investigation of motor vehicle arson cases, an activity which the report considered make-work largely duplicating the efforts of local police and fire departments. The report concluded that FCB was producing substantially no savings or other benefits to offset the cost of maintaining it at the then current level of personnel, a cost of about $750,000 annually in appropriated funds and more in expenses of compliance imposed on the insurance companies, all borne ultimately by policyholders.[4]

After the submission of the report, the Commissioner sent letters to fifty of the fifty-four FCB examiners notifying them that their employment was to terminate on June 15,

---

[4] All the administrative and operating costs of the FCB are assessed to the liability insurance companies operating in the Commonwealth. G. L. c. 26, § 8B.

1975,[5] by reason of lack of work. While stating that he did not consider the employees entitled to hearings regarding their dismissal, the Commissioner offered them the opportunity for hearings as under the civil service and veterans' tenure laws (G. L. c. 30, § 9A; c. 31, §§ 43, 45, 46A).

The two indicated hearings were conducted by the Commissioner in June, 1975, taking together six days. The whole group of examiners including the present plaintiffs were represented. The case presented to justify the dismissal consisted of the testimony and report of the deputy commissioner. This witness was cross-examined at length on the part of the examiners, and several FCB staff members and a State senator were called to testify in their behalf. There was scarcely any challenge to the circumstances of the fall in claim referrals and withdrawals as suggested by the report. Besides a certain amount of anecdotage about incidents of successful fraud investigation before the drop off, the examiners pressed the utility of FCB's arson investigations (a question, however, was raised whether a practice of investigating arson before the filing of a claim was consistent with the FCB statute).[6] The deputy commissioner reiterated his view that this work should be left elsewhere, and pointed out, incidentally, that no claims had been withdrawn as a result of FCB arson investigations during the preceding year.

In the light of the hearings, the Commissioner rendered his opinions holding that worthwhile FCB work had diminished steeply (ascribed to the introduction of "no fault"), and the dismissals accordingly were justified. Following the dismissals, FCB has continued to operate with a reduced staff of four.

1. *Procedural entitlement.* The examiners contended that they were tenured employees who could be properly appointed and removed only by the full FCB of three of-

---

[5] The four staff members with the greatest seniority were to be retained.

[6] See note 3 *supra.*

ficials,[7] and after compliance with the cause and hearing requirements of the civil service law, G. L. c. 31, § 43. They claimed that the military veterans among them achieved this status and the accompanying entitlement by virtue of G. L. c. 30, § 9A (veterans' rights),[8] while the others should be seen as similarly protected de facto although their positions had not been classified as permanent under the civil service law (see G. L. c. 31, § 1). Alternatively, the examiners asserted a contractual right to continued employment except for just cause, and to a hearing. Such a contractual right, they asserted, would eventuate in a constitutionally cognizable property right and thus to a due process right to a hearing. See *Perry* v. *Sindermann*, 408 U.S. 593 (1972). They appeared to argue that, whether the source of the right to a hearing was statutory or contractual, the provisions of the State Administrative Procedure Act (APA) for adjudicatory proceedings represented the relevant procedural standard. See G. L. c. 30A, §§ 1 (1), 10, 11; *Commonwealth* v. *Bessette*, 345 Mass. 358, 361-362 (1963) (APA standards apply to hearings before appointing authority under civil service law).

The defendants' position has been that the question of the continuation of the examiners' employment was committed by statute to the Commissioner's discretion, and that the collective bargaining agreement neither attempted to affect that statutory power nor could lawfully do so. But they said, further, that if APA standards indeed applied it would be found that the Commissioner's conduct in respect to the dismissals in fact conformed.

---

[7] The FCB consists of the Commissioner of Insurance or his designee, who serves as chairman, the Registrar of Motor Vehicles or his designee, and the Commissioner of Public Safety or his designee. G. L. c. 26, § 8B.

[8] This statute gives the equivalent of permanent civil service status, see G. L. c. 31, § 43, to veterans who have served three years in positions not classified under the civil service law, but, as later indicated in the text with citation of *Hanley* v. *Commissioner of Ins.*, 355 Mass. 784 (1969), it does not apply to the jobs of division of insurance examiners or other agency positions given over to free administrative discretion by statute.

We agree with the defendants. The forty-three plaintiff examiners could be dismissed at the Commissioner's discretion. Such discretion is conceded by the plaintiffs as to insurance division examiners generally. General Laws c. 26, § 7, reads in part: "The commissioner of insurance may appoint and remove, with the approval of the governor and council, a first deputy, an actuary, a research analyst, and a chief examiner and such additional deputies, examiners, assistant actuaries and inspectors as the service may require. . . . The commissioner may appoint and remove such clerical and other assistants as the work of the division may require." The freedom of the Commissioner's hand was confirmed in *Regan* v. *Commissioner of Ins.*, 343 Mass. 202, 205 (1961) ("determination of the sufficiency [of reasons] is in the discretion of the Commissioner"), and that this extends as well to veterans was the holding in *Hanley* v. *Commissioner of Ins.*, 355 Mass. 784 (1969).[9]

There is no showing why distinctive treatment should be accorded to FCB examiners. General Laws c. 26, § 8B, FCB's organic statute, states that the board "may appoint and remove a chief of accident claims investigations," but § 8B contains no further grant of power to the board to appoint or remove examiners. It does state that FCB "shall be

---

[9] The Civil Service Commission, in an amicus brief, citing general language from the earlier case of *Walsh* v. *Commissioners of Civil Serv.*, 300 Mass. 244 (1938), questions the *Hanley* decision and suggests that those examiners who are veterans may have a favored position in relation to the Commissioner's discretionary power of removal. The Commission's points are unpersuasive. (i) The brief urges that examiners are not "high-level" policymakers, and therefore may be withdrawn by the veterans' statute (G. L. c. 30, § 9A) from the Commissioner's exercise of his discretionary power. But G. L. c. 26, § 7, from which the Commissioner derives his authority, treats without distinction examiners and higher appointees; and the argument, if valid, could not be confined to veterans. (ii) The language of § 7 is not so obscure as to leave substantial doubt of its application to those coming under the veterans' statute. (iii) That the veterans' statute covers all involuntary separations while the civil service statute (G. L. c. 31, § 43) refers to removals and discharges does not appear significant with respect to the Commissioner's power; the dismissals here were acts of involuntary separation and of removal or discharge.

in the division of insurance" which invites the inference that FCB examiners are appointed and removed like other examiners in the division. FCB examiners have in fact been appointed by the Commissioner and not under the testing and appointment procedures of the civil service law, G. L. c. 31, § 1. This was a continuing practice that aroused no controversy. See *Director of the Civil Defense Agency & Office of Emergency Preparedness* v. *Civil Serv. Comm'n*, 373 Mass. 401, 410 (1977).

The examiners' claim that they were given civil service protection de facto rests on the circumstance that the job title of some included the word "permanent." But a permanent civil service appointment under G. L. c. 31, § 1, is "an appointment to a permanent position made in accordance with this chapter and the rules made thereunder," a description that does not apply to the plaintiff examiners (their letters of appointment appear in the record). On this matter the reasoning of *Director of the Civil Defense Agency & Office of Emergency Preparedness* v. *Civil Serv. Comm'n, supra,* is inapposite: there Governors had long denominated the positions in question civil service positions, and the Legislature had implicitly acquiesced, with the evident purpose of continuing the Commonwealth's eligibility for certain Federal funds. Here, by contrast, there has been a uniform treatment of FCB examiners like other examiners in the division.[10]

The Commissioner's statutory power to appoint and remove was not supplanted by the collective bargaining agreement covering these examiners.[11] One clause of that

[10] We note in addition that the present litigation would in all events encounter the obstacle that the plaintiffs failed to pursue the civil service law's procedures for reinstatement and the recovery of back pay. See G. L. c. 31, §§ 43 (b), 45, 46A.

[11] The agreement had by its terms expired at the time of the dismissals, but the statement of agreed facts relates that "the Division of Insurance voluntarily continued to adhere and apply the terms of this agreement to the employment of plaintiffs." The defendants do not dispute the binding force of the agreement in May and June, 1975, but merely claim that it was not violated.

agreement stated that nontenured employees should not be dismissed except for just cause, and provided for a right to a written statement of charges and a hearing. But the agreement also stated: "If any of the provisions of this agreement shall in any manner conflict with any . . . statutes of the Commonwealth of Massachusetts, or rules and regulations promulgated pursuant thereto, such provisions shall be considered null and void and shall not be binding on the parties hereto; and in such event, the remaining provisions of this agreement shall remain in full force and effect. Nothing in this contract shall be construed so as to derogate from the rights granted the Employer and employees by the statutes of the Commonwealth." We need not consider the question whether, even in the absence of a reservation, a contract provision could abridge a discretion vested in the Commissioner. See G. L. c. 150E, § 7; cf. *School Comm. of Danvers* v. *Tyman,* 372 Mass. 106, 111-113 (1977); *Dennis-Yarmouth Regional School Comm.* v. *Dennis Teachers Ass'n,* 372 Mass. 116, 120 (1977); *School Comm. of W. Bridgewater* v. *West Bridgewater Teachers' Ass'n,* 372 Mass. 121, 122 (1977).[12]

2. *Conduct of the hearings.* But if there was entitlement to hearings with fair procedures, then we think the civil service law, the APA, and any constitutional requirements were satisfied in the hearings presided over by the Commissioner, which seem to us to have been full and fair. We deal with the claimed procedural deficiencies.

(a) *Notice.* On its face the letter sent to the examiners gave reasonable information as to the time and place of the hearings and the issues to be considered. See G. L. c. 30A, § 11 (1). The Commissioner's expressed view that the hearings were not obligatory did not infect the notice or impair the quality of the hearings. There is criticism that the notice, which referred to "lack of work," did not warn that the efficiency and cost of the examiners' work would be con-

---

[12] There is the further point that no resort was made to the contractual and statutory grievance devices. See G. L. c. 30, § 53.

sidered, but these topics were certainly subtended by the inquiry whether there was worthwhile work for the whole complement of examiners. Significantly, the examiners did not ask added time to respond to these matters (see G. L. c. 30A, § 11 [1]), and they fail to show surprise to the extent of "prejudice" to their "substantial rights." § 14 (7).

(b) *Commissioner as adjudicator.* Although the examiners concede that the Commissioner was not disqualified from conducting the hearings by reason of his having inaugurated the deputy commissioner's investigation, they nevertheless suggest that he was biased against them because of his role in prompting the investigation of FCB and because he was evidently impressed by the report. The contention is answered by these words from *Withrow* v. *Larkin,* 421 U.S. 35, 55 (1975): "No specific foundation has been presented for suspecting that the Board [the State examining board for physicians] had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing. Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' *United States* v. *Morgan,* 313 U.S. 409, 421 (1941)." See also *Mayor of Everett* v. *Superior Court,* 324 Mass. 144, 150-151 (1949).

(c) *Use of subpoena power.* The Commissioner refused to allow the nonveteran examiners to bring in witnesses by subpoena. This did not conform to G. L. c. 30A, § 12 (3), but we are clear that there was no prejudice to the examiners' case. Of the two witnesses they meant to subpoena, one testified voluntarily. The other could have been summoned to the later veterans' hearing, at which use of subpoenas was permitted, but the witness was not summoned. On the record made we do not believe the examiners would

have added materially to their case if subpoenas had been available.

The Commissioner did not err in declining himself to obey a subpoena to give testimony at the veterans' hearing. An official conducting a hearing should not feel obliged to testify unless there is a strong showing of need, and here no such demonstration was made. See *Collins* v. *State*, 141 Ga. App. 121 (1977); *State* v. *Weiner*, 37 Ohio St. 2d 11 (1974). See also *Kendall* v. *Atkins*, 374 Mass. 320, 323-325 (1978) (practice of calling opposing counsel to be discouraged).

(d) *The questions of hearsay and relevance.* The examiners argue that the Commissioner's decision is invalid because it rests on hearsay in the form of the testimony and report of the deputy commissioner. Under the APA (G. L. c. 30A, § 11 [2]) an agency conducting an adjudicatory hearing "need not observe the rules of evidence observed by courts," but may rely on "the kind of evidence on which reasonable persons are accustomed to rely" in serious matters. That rule is satisfied here. We need not examine what vitality remains in our expressed view that an administrative decision should not be based solely on hearsay inadmissible in a court,[13] since a considerable part of the deputy commissioner's submission consisted of figures and other data of FCB which qualified as official written statements required to be kept by the FCB staff and therefore were admissible under an exception to the hearsay rule. See *Lodge* v. *Congress Taxi Ass'n*, 340 Mass. 570, 573 (1960); W.B. Leach & P.J. Liacos, Massachusetts Evidence 243 (4th ed. 1967); Fed. R. Evid. 803(8); cf. *Crowe* v. *Ward*, 363 Mass. 85, 89 (1973). Criticisms of the reception in evidence of parts of the deputy commissioner's presentation on grounds of irrelevance simply reflect the examiners' erroneously constricted idea of the "lack of work" issue which properly translates as the issue of lack of worthwhile work.

---

[13] See *Olde Towne Liquor Store, Inc.* v. *Alcoholic Beverages Control Comm'n*, 372 Mass. 152, 154 (1977); *Western Mass. Bus Lines, Inc.* v. *Department of Pub. Utils.*, 363 Mass. 61, 63 (1973).

3. *Substantial evidence.* We need not repeat or further detail the facts on which the Commissioner acted. We agree with the trial judge that they fully supported the measure he decided to take and furnished that "substantial evidence" required by the APA to be adduced as a basis for administrative decision. G. L. c. 30A, § 14 (8) (*e*).

4. *Usurpation of the legislative function.* Finally the examiners argue that their dismissal invaded a legislative prerogative in that it was an attempt to end a program required by statute to be perpetuated. They cite the case of *Local 2677, Am. Fed'n of Gov't Employees* v. *Phillips,* 358 F. Supp. 60 (D.D.C. 1973), holding that a poverty program for which Congress had appropriated funds must be carried through despite the administrator's preference for phasing it out. See Note, Impoundment of Funds, 86 Harv. L. Rev. 1505 (1973); Note, Protecting The Fisc: Executive Impoundment and Congressional Power, 82 Yale L.J. 1636 (1973).

*Phillips* dealt with the rather novel question of an administrative attempt to terminate a congressionally prescribed program, but the guiding principle is the old one that an agency must act as directed by its statute. In *Phillips* Congress had described a program which was to be promoted with the funds appropriated for it. The administrator refused to carry it out because of his disagreement with the congressional design. Thus he was defying the Legislature. In the present case the program itself was greatly reduced in scope through the happening of extraneous events. The Commissioner was accommodating to the situation by reducing force, leaving a small staff available to do the remaining work (subject to enlargement if the work should increase). This was by no means a defiance of the Legislature which had left flexible the number of examiners presumably to permit the Commissioner to deal with just such eventualities.

*Judgment affirmed.*