PETER VALENTINE & others[1] *vs.* RENT CONTROL BOARD OF CAMBRIDGE & another.[2]

No. 90-P-314.

Middlesex. May 18, 1990. - July 27, 1990.

Present: ARMSTRONG, BROWN, & GILLERMAN, JJ.

*Rent Control,* Judicial review, Controlled rental unit, Removal of unit from market, Exemption. *Cambridge. Municipal Corporations,* Rent control, By-laws and ordinances.

The Cambridge rent control board properly confined the scope of its inquiry with respect to certain applications for removal permits filed in connection with a major urban renewal project, in accordance with the objective of the controlling ordinance, i.e., to examine the effects of the proposed removals on the tenants involved and to mitigate depletion in the supply of rent-controlled dwelling units. [68-70]

The Cambridge rent control board properly, in accordance with the controlling ordinance, considered the benefits and hardships in connection with certain applications for removal permits and properly concluded that the granting of the applications would, in the circumstances, confer a net benefit on persons intended to be protected by the ordinance. [70-72]

The record of a proceeding before the Cambridge rent control board reflected no bias on the part of the chairman of that board or its members and no compromise of procedural fairness. [72-74]

CIVIL ACTIONS commenced in the Superior Court Department on July 13, 1989, and July 27, 1989, respectively.

After the cases were consolidated for trial, motions for summary judgment were heard by *Wendie I. Gershengorn,* J.

*Scott P. Lewis* for Massachusetts Institute of Technology.

*Carol Wagner* for Rent Control Board of Cambridge.

---

[1] William Noble, William Cavellini, and Michael Turk. The last two plaintiffs represent, respectively, groups called the Simplex Steering Committee and the Cambridge Rent Control Coalition. They were granted party status by the Cambridge rent control board in its proceedings.

[2] Massachusetts Institute of Technology.

*John L. Mason, Jr.*, for the plaintiffs.

ARMSTRONG, J. The plaintiffs appeal from a judgment upholding a decision of the Cambridge rent control board to issue to the landlord, Massachusetts Institute of Technology (M.I.T.), removal permits for twelve units of rent-controlled housing on Blanche and Green Streets in Cambridge. The removal permits are sought as part of a renewal project of major scope known as the University Park Development. The applications were initially filed four years ago[3] and have involved more than thirty days (partial or whole) of hearings at the board level and multiple court proceedings. The plaintiffs, who are tenants and tenant representatives, ask that we reverse the judgment and the board's decision and remand the case to the board for further hearings more comprehensive in scope than those had to date.

The dispute concerning the scope of the hearings crystallized early in the proceedings, when the board refused the tenants' application for enforcement of subpoenas duces tecum requiring M.I.T. to produce records concerning "the impact of [M.I.T.'s proposed] University Park Development as a whole on the availability of housing for low and moderate income people and elders on fixed income and aggravation of the housing shortage" in Cambridge. This ruling (the "August 29 ruling") reflected the board's view that the larger impact of the development on Cambridge's housing market was more properly the focus of other boards (such as the planning board, the city council, and so forth) and that it would confine its inquiry to the effect of the development on the supply in Cambridge of rent-controlled dwelling units.

We back up to describe the circumstances more fully. In 1986 M.I.T., in connection with a Chicago-based developer, Forest City Rental Properties Corporation, proposed a twenty-seven acre development (comprising office buildings, a retail market area, a hotel and conference center, research and development space, housing, and parking) on a site in

---

[3]The applications for the removal permits for the nine units of Blanche Street housing were filed in March, 1986. Those for the three units of Green Street housing were filed about a year later.

the Cambridgeport section of Cambridge known as the "Simplex" site (for a wire and cable manufacturing firm that formerly occupied the site). The site contained largely unoccupied industrial buildings, some vacant lots, and a scattering of residences. The latter were older residences and were thus subject to the Cambridge rent control statute, St. 1976, c. 36.[4]

Rent control had been authorized by the Legislature and approved by Cambridge in 1970 in response to a severe housing shortage that was causing inflationary increases in the rental market. Ten years of rent control led to a decline in the supply of controlled rental housing,[5] however, and Cambridge, in response, adopted a removal permit ordinance, applicable to all controlled rental units that had not been removed from the market before August 13, 1979. See *Flynn* v. *Cambridge*, 383 Mass. 152, 158-159 (1981). These included the twelve units at issue here.

The proposed hotel and conference center was to occupy a block at Blanche and Green Streets. Clearance of the block required the demolition or removal of five residences owned by M.I.T. on those streets. The five residences contained the twelve rental units that were the subject of M.I.T.'s applications for removal permits. Of the twelve units, eight were vacant. From around 1978 or 1979, apparently in anticipation of the development project, M.I.T. had neglected the properties and not filled (or perhaps, even, encouraged) vacancies.

In considering whether to grant removal permits, the board is required by § 1(d) of the removal ordinance to consider three factors:

"(1)   the benefits to the persons sought to be protected by the Act and by this section,

---

[4]Rent control had come to Cambridge under St. 1970, c. 842, and applied generally to dwelling units constructed before January 1, 1969.

[5]The first section of the removal permit ordinance (No. 966) declared that over ten percent of controlled rental units that existed in 1970 had by 1981 been removed from the housing market and that the vacancy rate among those that remained was less than one percent.

"(2)   the hardships imposed on the tenants residing in the unit proposed to be removed, including any mitigating provisions made by the applicant, and

"(3)   any aggravation of the shortage of decent rental housing accommodations, especially for families of low and moderate income and elderly people on fixed incomes, which may result from the removal."

M.I.T. proposed a specific plan to respond to the concerns of § 1(d): It would physically move a Green Street residence, containing three of the controlled rent units — all of which have tenants — to a comparably sized lot about 1,000 feet away; and it would move a Blanche Street residence containing three of the rent-controlled units — only one of which has a tenant — to a somewhat larger (although less attractively located) lot about 900 feet away. Each of these residences would be renovated, and M.I.T. would bear the entire cost of moving and renovation without seeking to have the cost reflected in the controlled rent levels ($129 to $138 per month). For each of the four tenants dislocated during the moving work (they were all single), M.I.T. would meet the cost of temporary housing (including kennels for pets) as well as moving expenses and a daily per diem rate ($25 to $40 per day) for incidentals. Three Blanche Street residences—each containing two vacant rent-controlled units—would be demolished, and M.I.T. would replace them with six similarly sized rental units from its stock of exempt rental housing (these are so-called "affiliate" rental units, discussed in more detail below), transferring the present Blanche Street rents ($108 to $167 per month) to the six replacement units and accepting tenants designated by the Cambridge Housing Authority. In addition, M.I.T. would construct six units of new low-to-moderate income housing at Brookline and Pacific Streets, on the perimeter of the development, to be rented at market rates.

At the extensive hearings on the applications the board's hearing examiner received evidence bearing directly on the hardships to each of the four tenants, the duration of the va-

cancies, the condition of the present residences, the character of the replacement residences, the effect of the removals and the development on the neighborhood, and so forth. He received evidence concerning the development plans, including the housing component (at least 250 newly constructed units, exclusive of the six at Brookline and Pacific Streets, twenty-five percent of which would be designated for low-to-moderate income tenants), but, in accordance with the board's August 29 ruling, declined to receive evidence concerning the additional demands for housing that would be generated by the development project and the effect of this increased demand on the Cambridge housing market generally.

The hearing examiner recommended that the board deny the removal permits. He perceived in M.I.T.'s relocation plan no "benefit to the persons sought to be protected by the [rent control law]" (§ 1[d][1]) to offset "the hardships imposed on the tenants residing in the unit[s] proposed to be removed" (§ 1[d][2]). The exchange of six exempt units for the six units to be demolished would not effect an increase in the number of low-income units. The living space of the twelve rent-controlled units would remain about the same, as would rents. The renovations to the dilapidated units should not count as a benefit, he reasoned, because work along those lines was mandated independently by State and local codes. The six low-to-moderate income market-rate units at Brookline and Pacific Streets and the additional 250 promised housing units within the development did not count as a benefit for two reasons: first, those parts of the development project could be constructed without reference to the grant or denial of the removal permits (only the hotel and conference center were to occupy the block at Blanche and Green Streets); and, second, the additions to the housing supply logically should not count as a benefit without reference to the increased demand for housing that would be generated by the development, as to which evidence had been excluded under the August 29 ruling.

As to the third factor listed in the ordinance ("any aggravation of the shortage of decent rental housing accommoda-

tions, especially for families of low and moderate income and elderly people on fixed incomes, which may result from the removal," § 1[d][3]), the hearing examiner found there *was* an aggravation, despite the fact that the twelve replacement units were to be comparable in quality and identical in rent to the twelve existing units. One reason, in the hearing examiner's view, was that M.I.T. had *already* aggravated the shortage of rental housing by leaving the Blanche Street units vacant since 1979. Nothing in its proposal compensated for this aggravation. A second reason was that (in his view) the demolition of six Blanche Street units was not adequately offset by the conversion of six units of "affiliate housing" to rent control because those units were already subject to rent control in a latent sense: that is to say, they would come under rent control whenever M.I.T. should cease to use them as affiliate housing.[6] Stated differently, the conversion reduced the supply of potential (as opposed to active) controlled rental units, with no compensating increase in the number of active controlled rental units.

On March 16, 1988, the board at a public hearing considered the report and recommendations of the hearing examiner.[7] After listening to arguments of counsel, some members took issue with the hearing examiner's finding (no. 56) concerning aggravation of the housing shortage (§ 1[d][3]). The chairman of the board suggested that she agreed with the hearing examiner's ultimate recommendation on M.I.T.'s proposal as it then stood but that the balance would tilt (in her view) towards a net benefit if M.I.T. were to agree to amend its proposal to subject the six units of new low-to-moderate rent housing at Brookline and Pacific Streets to the rent-control regime. Another member seconded that view. Counsel for M.I.T., protesting that it was entitled as matter

---

[6]More explanation of affiliate housing appears *infra* at 70-72.

[7]The record does not contain a transcript of the hearing, but an affidavit was furnished by one of the tenants, William Noble, detailing what he regarded as procedural irregularities in the hearing. The quotes were taken from tape recordings, and it is not suggested that they were inaccurate. We have assumed the truth of the affidavit, although it is not pivotal to our decision.

of law to a grant of the permits on its unamended proposal, nevertheless suggested that it would consider the modification and suggested that the board might wish to order a very short evidentiary hearing with respect to the modification. The chairman doubted that such an evidentiary hearing was required. Counsel for the tenants argued that the board must vote yes or no on the basis of the proposal as presented and that consideration of modifications would be procedurally improper.

On March 25, 1988, the board announced its decision. By a three-to-two vote, it adopted the hearing examiner's findings (except for a portion of finding 56) and his recommendation to deny the removal permits. By a further three-to-two vote, however, the board decided to issue the removal permits subject to several conditions. The most important for purposes of this appeal was condition 5:

> "M.I.T. shall within one year of the date of its acceptance of the conditions of this notice of ruling build six new housing units on the corner of Brookline and Pacific Streets. These units shall contain at least two bedrooms and shall be at least as large as the six units to be demolished on Blanche Street. These units will be rent-controlled units for so long as rent control exists within the City of Cambridge, and the legal maximum rent for each unit shall be set within the range of the present median rent range for four-to-five room unheated units, which range is $325 to $350 per month. These units shall be rented to low and moderate income persons identified by the Cambridge Housing Authority."

M.I.T. accepted the conditions, and on April 15, 1988, the board by a further ruling ordered issuance of the permits subject to the conditions detailed on March 25. The tenants appealed to the Superior Court.

In retrospect, the form of the March 25, 1988, ruling was unfortunate. It led to a year of delay. The appeal came on for hearing in the autumn of 1988. A judge of the Superior

Court ordered the case remanded to the board for further proceedings, necessitated, he thought, by two procedural defects. First, the board had, in effect, exhausted its power when it voted to deny the removal permits. Subsequent consideration of the proposal as modified (by the conditions) was improper, not because the board lacked power to impose such conditions, but because the board had previously disposed of the matter. (The judge also thought that the opportunity of the parties to present positions on the board-inspired modifications had been compromised.) The second reason related to the exclusion of evidence of the over-all effect of the University Park Development on the Cambridge housing shortage. Noting that evidence was received concerning the positive effect (i.e., the addition of 250 plus units to the Cambridge housing supply), the judge felt that consistency required consideration of the negative effect (in the form of increased demand for housing the development would generate). The board's decision was vacated, and the case was remanded for the taking of evidence on the negative effect and for re-voting on the applications.

The board took the position on remand that the effect of the 250 new units to alleviate the housing shortage had played no part whatever in its earlier decision,[8] that it regarded the "market" effect of the development as beyond the board's proper sphere, and that no purpose would be served by its hearing evidence speculating on the "negative," or shortage-aggravating effects. Feeling that the refusal to receive the evidence would violate the remand order, the tenants brought an action against the board's members for contempt of court. Another judge "clarified" the remand order by narrowing it. The tenants sought reconsideration. The judge somewhat obscurely modified the clarification order. Further court proceedings were held (concerning subpoenas). Further hearings before the hearing examiner produced testimony and documents that the hearing examiner ultimately

---

[8]The board had, it pointed out, adopted the hearing examiner's findings that the new housing construction was not dependent on issuance of the removal permits.

struck as irrelevant. The tenants sought further evidentiary hearings. The board refused. The tenants sought to have the board's chairman recuse herself (her impartiality being compromised by her authorship of the modifications). She refused. On June 28, 1989, a decision emerged from the thicket that struck all findings from the hearing examiner's initial report relative to the new-housing component of the proposed development, reaffirmed the board's view that the development would proceed whether or not the removal permits were granted, found that the removals (in light of the addition of six new rent-controlled units) would effect a net benefit to persons sought to be protected by rent control (§ 1[d][1]) and that the removals would not aggravate the shortage of decent rental housing accommodations (§ 1[d][3]). It ordered the removal permits to be issued subject to conditions substantially identical to those originally ordered March 25, 1988.

A judge of the Superior Court affirmed this decision on December 21, 1989, and the plaintiffs have appealed from the resulting judgment.[9]

1. *Scope of the hearings.* When the rent control board initially determined that the general effect of the University Park Development on the Cambridge housing market was irrelevant to its decision on the twelve removal applications (the August 29 ruling), it implicitly based its decision on the scope of its role under § 1(d) of the removal ordinance, rather than on the alternate basis that arose from the findings of the hearing examiner (i.e., that the development would proceed whether the removal permits were issued or not, all that was involved being the precise location of the hotel-conference center). The board's determination to so limit its consideration was not erroneous in any event.

---

[9]A single justice of this court expedited the hearing of the appeal but denied a stay of the judgment. We are informed that the three vacant Blanche Street residences marked for demolition have now been demolished, but M.I.T. has acknowledged its obligation to replace them should the judgment after appeal so require.

Although the Cambridge rent control law may have arisen out of a crisis in the rental market caused by a condition of severe shortage (see *Amari* v. *Rent Control Bd. of Cambridge,* 21 Mass. App. Ct. 598, 604 [1986]), the removal permit ordinance, first adopted in 1979 (see *Slade* v. *Mc-Laughlin,* 402 Mass. 432, 433 n.3 [1988]), had a very specific purpose: to prevent further depletion of the existing stock of rent-controlled dwelling units. See *Flynn* v. *Cambridge,* 383 Mass. at 158-159. "In essence, what the ordinance does is require that any unit which is a controlled rental unit on August 10, 1979, remain part of the rental housing stock of the city of Cambridge." *Id.* at 156. *Lamb* v. *Rent Control Bd. of Cambridge,* 17 Mass. App. Ct. 1038 (1984). "The board since 1979 has had the power to regulate the withdrawal of residential units from the market and to make reasonably sure that withdrawal is for a bona fide purpose." *Vincent* v. *Rent Control Bd. of Cambridge,* 23 Mass. App. Ct. 927, 928 (1986). The limited purpose of the ordinance to preserve the existing supply of rental housing is evidenced both by its preamble (§ 1[a] of the ordinance) and by its "effectiveness" provision (§1 [e][2]), which provides for automatic suspension of the removal ordinance, contingent (in part) on restoration of the total stock of rental housing to the level that existed when rent control began in Cambridge.

The board did not err in construing the scope of its inquiry under § 1(d) in accordance with the over-all objective of the removal ordinance to mitigate further depletion in the numbers of rent-controlled dwelling units. Compare *Martin* v. *Rent Control Bd. of Cambridge,* 19 Mass. App. Ct. 745, 748-749 (1985). The tenants' more expansive view of the board's role would empower the board to veto any development that, in its view, has a potential to aggravate the housing shortage — provided, that is, that the development necessitated removal of a rent-controlled unit, thereby giving the board jurisdiction. Unless such a unit were involved, the board would clearly have no say in plans to bring new business or industrial facilities into Cambridge, no matter how predictable or drastic the impact on the demand for housing.

The removal permit ordinance was not intended to constitute the board a development czar. The board prudently and correctly interpreted its proper role as focusing on preservation of rent-controlled units.[10]

The tenants argue that the words of § 1(d)(3), "aggravation of the shortage of decent rental housing accommodations," compel the board to undertake inquiry into the total effect of the development plan on the Cambridge housing market. But those words are limited by the words that follow, "which may result from the *removal*" (emphasis supplied). The focus is thus on the effect of the removals and not on the effects of the total development plan of which the removals are a part. The board's interpretation of its role was, thus, solidly grounded in the words of § 1(d) as well as the over-all objective of the removal ordinance. As such, its interpretation is entitled to deference from a reviewing court. *Polednak* v. *Rent Control Bd. of Cambridge*, 397 Mass. 854, 858 (1986). *H.N. Gorin & Leeder Mgmt. Co.* v. *Rent Control Bd. of Cambridge*, 18 Mass. App. Ct. 272, 276 (1984). *Amari* v. *Rent Control Bd. of Cambridge*, 21 Mass. App. Ct. at 604-605. The judge correctly sustained the board's decision to confine its inquiry to the effects of the removals on the tenants involved and on preventing or minimizing the depletion of controlled rental units.

2. *The "affiliate" units.* The Cambridge rent control act contains an exemption for "rental units in any . . . college or school dormitory operated exclusively for . . . educational purposes." St. 1976, c. 36, § 3(*b*)(5). In 1972 the rent con-

---

[10]We do not suggest that the board acted improperly in requiring M.I.T. to subject the six new units at Brookline and Pacific Streets to rent control as a condition of issuance of the permits. The board there acted within the confines of the plan, based on findings that the plan would otherwise deplete the latent supply of rent-controlled housing (by using up affiliate units), and its proposed condition was commensurate to the harmful impact. Conditions, to be valid, must be reasonable in degree, and they must be related to the potential evils that led to the creation of the permit-granting power. Compare *Middlesex & Boston St. Ry.* v. *Aldermen of Newton*, 371 Mass. 849, 851-853 (1977), and *Lovaco, Inc.* v. *Zoning Bd. of Appeals of Attleboro*, 23 Mass. App. Ct. 239, 241-243 (1986). By that standard condition 5 was not inappropriate.

trol board interpreted this exemption to include "[r]ental units . . . reserved for rental to persons required to have an affiliation with [M.I.T.] in order to be entitled to enter into an agreement to rent such units." Prior to passage of the removal permit ordinance in 1979, there was no legal restriction on withdrawing a unit from rent control by converting it to an exempt use. *Amari* v. *Rent Control Bd. of Cambridge*, 21 Mass. App. Ct. at 603 n.11. *Slade* v. *McLaughlin*, 24 Mass. App. Ct. 778, 780 (1987), *S.C.*, 402 Mass. 432, 436 (1988). Thus a college could purchase a controlled rental unit, dedicate it to affiliate use, and thereby remove the unit from rent control. It was, apparently, not until 1984 that the board expressly ruled (by its regulation 48-07) that removal of a controlled rental unit from the market by dedication to affiliate use required a removal permit.

The tenants, contending that the removal permit ordinance was self-executing (see, e.g., *Lamb* v. *Rent Control Bd. of Cambridge*, 17 Mass. App. Ct. 1038, 1039 [1984]), offered evidence that M.I.T. had converted thirty-seven controlled units to affiliate use without removal permits between August 10, 1979, the effective date of the removal permit ordinance, and the adoption of regulation 48-07 in 1984. The matter was germane, the tenants argued, because M.I.T.'s proposal treated the restoration of affiliate units to rent control as if it were a concession.

The status of affiliate housing generally was a collateral issue; the board was not required to resolve it in this removal permit proceeding. At the heart of the tenants' position is the assumption that, to be eligible for removal permits, M.I.T. must show a net benefit to persons intended to be protected by the ordinance.[11] The ordinance has no absolute requirement to this effect. It merely requires that the board consider the benefits and hardships before it acts on a removal permit application. In any event, the board could properly find a net benefit (according to the tenants' rigid calculus), if not in M.I.T.'s proposal as first advanced, at least in M.I.T.'s plan

---

[11]In the words of the tenants' brief (at 42): "The Ordinance requires a 'benefit' and not just an even trade."

as conditioned by the board. Before the removals M.I.T. had twelve controlled rental units, of which eight were vacant, and an uncertain number of affiliate units that arguably should be subject to rent control. Under the permits as conditioned, M.I.T. will have eighteen units of active controlled rental housing, twelve of which will have artificially low rent levels (carried over from the Blanche and Green Street units), with all vacancies to be filled through the Cambridge housing authority, and with a depletion in the number of latent controlled rental units (the affiliate units) of no more than six. That calculus amply supports the board's finding that the removals would confer a net benefit on persons intended to be protected by the ordinance.[12]

3. *Recusal of the chairman.* Relying on cases that have little if any similarity to this one,[13] the tenants argue that the chairman of the board showed partiality when she proposed the condition subjecting the new Brookline and Pacific Street housing units to rent control. The members of the board, before the hearing started, had read the exhaustive report of the hearing examiner, which included a synopsis of the evidence and the contentions of the parties as well as his findings and conclusions. The members' impartiality was not compromised by discussing at the outset their reactions to the report and their concerns about M.I.T.'s proposal. Doubtless many counsel would prefer to argue their positions in a vacuum, unaware what the board members are thinking.

---

[12]Not separately discussed is the tenants' argument that the board should have exacted a penalty from M.I.T. to punish it for having failed to maintain the controlled rental units on Blanche Street and for having failed to fill (or, in the tenants' words, "refused to fill") vacancies. This matter also lay in the sound discretion of the board (which in its decision pointed out that the failure to maintain the Blanche Street units was the subject of another proceeding still pending).

[13]*Preston* v. *Peck*, 271 Mass. 159 (1930)(judge announces his finding on the contested issue of fact before hearing the evidence), *Ott* v. *Board of Registration in Medicine*, 276 Mass. 566 (1931)(board members make sarcastic and insulting comments towards attorney for physician), and *Beauregard* v. *Dailey*, 294 Mass. 315, 324-325 (1936)(involving a master who was acting as attorney, in unrelated proceedings, for one of the parties in the case heard by him).

Others doubtless prefer an open, informal give and take, feeling it enables them to respond more directly to those points most of concern to the board's members. The differences are largely ones of style. Nothing in this record reflects disabling bias on the part of the chairman or the other members of the board.

Members of administrative boards combine, in varying degree, three roles: those of fact-finder, regulator, and prosecutor. As fact-finders they are expected to act without bias, on the basis of evidence adduced at a hearing; but as regulators, entrusted with the administration of a specialized area of law, they are expected to bring to adjudication extensive knowledge of conditions in the community to which that law applies and to fashion (by decision or by regulation) practical policies to further the basic objectives of that law. As prosecutors they are necessarily partisan, empowered to investigate and to proceed against violations of the law; but, like their counterparts in criminal law enforcement, they are vested with discretion that, properly used, brings fairness and common sense to the application of the law. In adjudication board members are expected to act without self-interest or personal animus, but they are not expected to be free from preconceptions grounded in the policies of the law they administer or from knowledge of conditions in the community to which that law applies. The procedural law recognizes this multiplicity of roles, by making members of adjudicatory boards, unlike trial judges, parties to appeals from their own decisions.

Here the chairman of the rent control board suggested a modification to the plan that would, in her mind, put to rest any concern raised by the hearing examiner's findings that the removals would operate to the detriment of persons sought to be protected by the ordinance or would aggravate the shortage of controlled rental housing. The suggestion was grounded solely in the policy of the rent control law. The parties were given ample opportunity to comment on the suggestion, at least after remand. There was no impropriety by the chairman, and, especially in light of the remand, there

was no compromise of procedural fairness. Compare *Dwyer v. Commissioner of Ins.*, 375 Mass. 227, 235 (1978). See generally Cella, Administrative Law & Practice §§ 318, 319 (1986), 3 Davis, Administrative Law Treatise §§ 19.1, 19.2, 19.4 (2d ed. 1980), and Schwartz, Administrative Law § 6.18 (2d ed. 1984).

Other points separately touched on by the tenants either are covered by what has been said above or are without sufficient merit to require discussion.

*Judgment affirmed.*

BROWN, J. (concurring). I concur in the majority opinion. I write separately in this instance, however, not because of the manners and mores of those involved in commerce, see, e.g., *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 699 (1986) (Brown, J., concurring in part and dissenting in part), which do here seem to warrant a firm rebuke,[1] but to indicate once again my disapproval of the efforts of counsel, here the plaintiffs' attorneys.

It appears in this case that the giant — M.I.T. — held the cards, but nevertheless played the game in a reasonable manner. In my view of the case, it seems unfortunate that the interests of the individual tenants (only two of whom are parties to this appeal) may have become subordinate to the interests of the groups who were given "party status" by the board in these proceedings. Cf. *N.A.A.C.P.* v. *Button*, 371 U.S. 415, 462 (1963) (Harlan, J., dissenting). Perhaps greater gains could have been obtained for the individual tenants if both (or all) of them had been represented by counsel who were not also representing the neighborhood and city-wide groups. See generally Bell, Serving Two Masters: Integration Ideals and Client Interest In School Desegregation Litigation, 85 Yale L.J. 470, 488-516 (1976).

---

[1] If M.I.T. did intend to circumvent the purposes of the Rent Control Law (i.e., by allowing its properties to become substandard and stay vacant), I am obliged to indicate my disgust and disappointment.

Perhaps also, direct negotiation between M.I.T. and counsel for the individual tenants would have achieved such gains more quickly and more effectively than the tortuous litigation which ensued (as the majority notes, more than thirty days of hearings and numerous court actions). As the majority opinion establishes, the legal issues here were trivial and the board's action close to bulletproof.